**CITY OF PORT ARTHUR, TEXAS, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. A. No. 80-0648.**

United States District Court, District of Columbia.

June 12, 1981.

---

990

Robert Q. Keith, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., for plaintiff, with whom were George Wikoff, City Atty., Port Arthur, Tex., and James D. Welch and Greer S. Goldman, Wald, Harkrader & Ross, Washington, D.C.

J. Gerald Hebert and Robert S. Berman, Attys., U.S. Dept. of Justice, Washington, D.C., for defendant United States of America, with whom were Drew S. Days, Asst. Atty. Gen., and Gerald W. Jones and Paul F. Hancock, Attys., U.S. Dept. of Justice, Washington, D.C.

Elizabeth K. Julian and Michael M. Daniel, East Texas Legal Services, Dallas, Tex., for intervenor-defendants Abraham Douglas, et al., with whom was Norman J. Chachkin, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.

Before J. SKELLY WRIGHT, Circuit Judge, and JOHN LEWIS SMITH, Jr., and CHARLES R. RICHEY, District Judges.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This is an action for declaratory relief brought under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (Supp. 1974–1980).[1] Unless a state or political sub-

---

1. Section 5 provides:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which .the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of

this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)2 of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, stan-

division receives the approval of the Attorney General of the United States for a change in its voting standards, practices or procedures, section 5 requires that the entity must demonstrate to a three-judge panel of the United States District Court for the District of Columbia that the change it seeks to enforce has neither the purpose nor effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. Plaintiff City of Port Arthur, Texas, has filed this suit in order to obtain a declaration upholding the validity of several voting changes occasioned by the expansion of the boundaries of the City, by the City's adoption of two new electoral plans for the enlarged community, and by the establishment of elected advisory councils for two of the added areas.

With the consent of the parties,[2] evidence consisting of numerous depositions, exhibits, and the in-court testimony of several witnesses was initially presented to a single judge. Complete copies of the record were then distributed to the two other judges. Ultimately, the full three-judge court heard oral argument on all aspects of the case.

Upon consideration of the entire record herein, we conclude that plaintiff's request for a declaratory judgment must be denied. Although we are convinced that the territorial expansion was accomplished without a discriminatory purpose, the subsequently adopted election plans were fatally infected by such an intent. Moreover, the implementation of any of the voting schemes presented would most probably have the effect of abridging the electoral rights of Port Arthur's minority communities. With respect to the advisory councils, we find the absence of a discriminatory purpose and the presence of a discriminatory effect. The opinion which follows sets forth our findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## I. FACTUAL FINDINGS

### A. General Background

Plaintiff City of Port Arthur ("Port Arthur" or "the City") is a municipality located on the southeastern boundary of the State of Texas. It lies approximately 90 miles east of Houston in the southern portion of Jefferson County on the salt-grass marshland adjacent to the Gulf of Mexico. Sabine Lake and the Sabine-Neches waterway border the City on the south while the municipalities of Nederland, Groves, and Port Neches pose a barrier to the north and east. West of Port Arthur is a wildlife management area and several large petroleum company complexes. Due to the location of the City and the resources at hand, the population is primarily engaged in oil

---

dard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no

objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

2. Plaintiff City of Port Arthur originally sued the United States of America for a declaratory judgment. Shortly thereafter, four black residents of Port Arthur, Abraham Douglas, Elgie Jenkins, Walter Mosely, and Willie Lewis, were granted permission to intervene as party-defendants.

refining, petro-chemical manufacturing, sea-faring, and related occupations.[3]

Within the general area occupied by Port Arthur are four communities which are of central concern in this litigation. The Town of Lakeview ("Lakeview"), the City of Griffing Park ("Griffing Park"), and the City of Pear Ridge ("Pear Ridge") are all incorporated entities covering less than one square mile each. Lakeview overlooks Lake Sabine and is surrounded on all sides by Port Arthur. Situated one mile to the north is Griffing Park which edges Groves on the east and Pear Ridge on the north-west but is otherwise enveloped by the plaintiff City. Aside from its shared border with Griffing Park, Pear Ridge is totally enclosed by Port Arthur. Finally, there is a fourth unincorporated area known as Sabine Pass which is situated eight miles to the south of the City.[4]

■ According to the figures published by the United States Bureau of Census, the total population of the City of Port Arthur has been decreasing from 66,676 in 1960 through 57,371 in 1970 to 54,485 in 1980.[5]

---

**3.** Amended Joint Statement of Undisputed Material Facts ("A.J.S.") ¶¶ 2, 88, 89. *See* Appendix A. References to "north" in this opinion should technically be to "north-north-west"; all other directions should be adjusted accordingly.

**4.** *See* Appendix A.

**5.** The 1960 population statistics were obtained from A.J.S. ¶ 7. The demographic data for 1970 was derived from A.J.S. ¶¶ 9–10, 17–18, 25–26, 29, 68–69 and Exhibit ("Exh.") 95. Finally, although the parties have submitted estimates for 1979 and 1980 prepared by demographers Lyle Vickers and Thomas Hofeller respectively, *see* Exh. 49, 52, 87, 112–13, the Court must rely upon "the most current available population data," the official figures provided in the 1980 Census. *City of Rome, Georgia v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 1567, 64 L.Ed.2d 119 (1980). The 1980 Census was first published after trial, but, with the consent of the parties and in accordance with the law, we take judicial notice of that information. *See Mitchell v. Rose*, 570 F.2d 129, 132 n.2 (6th Cir. 1978), *rev'd on other grounds sub nom. Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979); *Goins v. Allgood*, 391 F.2d 692, 697 (5th Cir. 1968); Fed.R.Evid. 201(f); Defendant United States of America's Request to Take Judicial Notice of the 1980 Census (filed April 3, 1981) ("Defendant's Request to Take Judicial Notice"); Plaintiff's Reply to Defendant's Supplemental Pleading Regarding 1980 Census at 1 (filed April 22, 1981) ("Plaintiff's Reply to Defendant's Supplemental Pleading").

The 1970 and 1980 Census statistics break down as follows:

| | Port Arthur | Pear Ridge | Lakeview | Sabine Pass | Total |
|---|---|---|---|---|---|
| **1970 Census** | | | | | |
| Total | 57,371 | 3,697 | 3,567 | 1,143 | 65,778 |
| Black | 22,994 | 2 | 1 | 100 | 23,097 |
| % Black | 40.01% | 0.05% | 0.03% | 8.75% | 35.11% |
| Mex-Am | 3,809 | 411 | 309 | 0 | 4,529 |
| % Mex-Am | 6.64% | 11.12% | 8.66% | 0.00% | 6.88% |
| VAP | 37,636 | 2,405 | 2,474 | 696 | 43,211 |
| Black VAP | 13,033 | 2 | 0 | 61 | 13,096 |
| % Black VAP | 34.62% | 0.08% | 0.00% | 8.76% | 30.31% |
| **1980 Census** | | | | | |
| Total | 54,485 | 3,091 | 2,917 | 501 | 60,994 |
| Black | 24,630 | 12 | 68 | 31 | 24,741 |
| % Black | 45.21% | 0.39% | 2.33% | 6.19% | 40.56% |
| Mex-Am | 3,120 | 353 | 352 | 18 | 3,843 |
| % Mex-Am | 5.73% | 11.42% | 12.07% | 3.59% | 6.30% |

In compiling the above chart, the Court encountered several problems. First, the only VAP figures available are those presented in the 1970 Census; neither the estimates nor the 1980 Census include such information. Second, the 1970 VAP count for Sabine Pass was not to be found in the record, and, therefore, we have extrapolated from the relevant numbers. More specifically, the total VAP for Sabine Pass was calculated by subtracting the VAP's for Port Arthur, Pear Ridge and Lakeview from that of the expanded City, and then

Simultaneously, the percentage of the municipal population comprised by blacks has increased significantly; the black proportion of the population was 30.79% in 1960, 40.01% in 1970, and 45.21% in 1980. In addition, several other minorities have always contributed a small fraction of the population. Between 6 and 7% of all Port Arthurians, for example are of Spanish origin. Although current statistics as to the number of individuals of voting age in each of these groups are unavailable, the 1970 Census revealed that the total voting-age population ("VAP") was 37,636 of whom 13,033 or 34.62% were black.

By contrast, the four communities mentioned above have far fewer and predominantly white residents.[6] The total population of Pear Ridge, Lakeview and Sabine Pass, for example, was 8,407 in 1970 and only 6,509 in 1980.[7] In those same areas, blacks numbered 103 or 1.23% and Mexican-Americans, 720 or 8.56% in 1970; by 1980, there were 111 or 1.71% black and 723 or 11.11% Hispanic citizens. Individuals of voting age totalled only 5,575 of whom 63 or 1.13% were black in 1970.

**B. Historical Background of Port Arthur**
**1. Political history to 1963**

The City of Port Arthur was founded in 1898, and it has operated under its own Charter since March 8, 1932, in accordance with the so-called "home-rule amendment" of the Texas Constitution.[8] City officials were elected by at-large vote until 1954.[9] Then, between 1954 and 1963, Port Arthur adopted the commission-manager form of government and the single-member district or ward system.[10] Each of the seven commissioners was required to be a resident of the district which he or she represented, and each was elected by only the qualified voters in the district. The commissioners served two year terms with four of the commissioners elected at one time and the remaining three elected the following year. It was necessary that candidates receive a majority of the vote in order to get elected. Following each election, one of the seven commissioners was selected by the commission to serve as mayor.

Throughout the period when this single-member district plan was in effect, the districts were essentially drawn on a north-south axis parallel to the named avenues of the City.[11] The black population was heavily concentrated in District 1, the area west of Houston Avenue,[12] and the commission

---

that total was multiplied by the 8.75% of the Sabine Pass population comprised by blacks. The third problem results from the difference in the 1980 Census analyses prepared by defendant United States and plaintiff. *See* Defendant's Request to Take Judicial Notice; Plaintiff's Reply to Defendant's Supplemental Pleading. We agree with the United States that the 201 individuals in census tracts 51.99, 66.99 and 116.99 who are crew members on vessels in the Port of Port Arthur should be excluded from our computations because of the improbability that they would be present to vote in a municipal election. *See* affidavit of Robert S. Berman at 4 (April 3, 1981). However, we do not accept plaintiff's suggestion that the residents of Spanish origin be subtracted from the "white" population. *See* affidavit of Lyle Vickers at 3 (April 20, 1981). It is true that Port Arthurians of Spanish descent appear to be double counted, but the Court does not believe that such individuals are always included in the "white" population. Census tract 57, for example, contains 7 persons of Spanish origin, but it has only 4 white inhabitants.

6. *See* note 5 *supra*. Griffing Park housed 2,075 people of whom 4 were black in 1970.

7. Griffing Park has been excluded from these totals because it never joined with the City of Port Arthur as did the other areas in question.

8. A.J.S. ¶¶ 87, 93–94.

9. A.J.S. ¶ 95.

10. A.J.S. ¶ 3.

11. Trial Transcript I, 95–96, 98–99 (November 24, 1980) (testimony of George Dibrell). The trial transcript in this proceeding was not paginated consecutively over both days of trial. Consequently, the Court will refer to the two volumes of the transcript in the following manner: Tr. I for the transcript of November 24, 1980, and Tr. II for the transcript of November 25, 1980. *See also* Exh. 121.

12. United States Preliminary Proposed Findings of Fact and Conclusions of Law ("U.S.P. F.") ¶ 31 (admitted); Evans Deposition ("Dep.") 7, 10, 12; Freeman Dep. 5–6; Guidry Dep. 5, 20.

regularly included a single black member elected from that district between 1954 and 1963.[13] Beginning with the construction of the first urban renewal project in 1957, a significant number of blacks began to move eastward across Houston Avenue into the traditional white residential areas which constituted the other election districts.[14] By 1960, it appeared that District 2 was going to become as predominantly black as District 1.[15]

In 1963, however, the results of a Charter change referendum compelled the City to alter the form of government.[16] From that time on, Port Arthur has been governed by a seven-member council and a professional manager who operates the City and carries out the policies of the City Council.[17] According to the so-called 6-0-1 plan,[18] six of the council members are each required to live in newly-drawn residency districts including the old District 1, three new districts drawn along an east-west axis, and two additional districts covering the large area to the north.[19] In order to win a seat, however, a candidate has to be elected by a majority of all of the qualified voters in the City. The seventh position, the mayoral place is similarly filled by an at-large contest, but the mayor is not required to reside in any particular district. Although the mayor bears certain ceremonial and "political" responsibilities not shared by the other members of the Council, he casts a vote on each matter under consideration just as his fellow officials do.[20] Each year, three council members are elected, and the three others along with the mayor are voted on the following year.

This Charter amendment was overwhelmingly approved by the citizens of Port Arthur who cast 6,829 votes in its favor and lodged only 1,022 votes against it; blacks and whites alike supported the measure.[21] In an effort to explain the motivation for this change, plaintiff demonstrated that Port Arthur had been plagued by widespread corruption while the single-member district plan was extant.[22] Whether or not the ward system actually spawned the illegal activities, the citizens of Port Arthur believed that there was such a connection.[23] No justification was offered, however, for the redrawing of district boundaries along east-west lines. The record bears witness to the fact that this redistricting had the effect of maintaining the concentration of blacks in District 1 while simultaneously fragmenting the growing black population east of Houston Avenue in Districts 2, 3, and 4 by combining it with the larger white population on the east side of the City.[24] Consequently, a minority candidate from the western portion of District 2, 3, or 4 would face a white opponent from the east.

## 2. 1963 to 1977

Under the at-large system, Port Arthur received national recognition when nominated as an All American City in 1970 and when given the award of the National Municipal League in 1973.[25] Nevertheless, racial tension festered beneath the surface. As blacks moved east across Houston Avenue, whites moved further east and even

13. Guidry Dep. 5–6, 9–10.

14. A.J.S. ¶ 30; U.S.P.F. ¶¶ 32–34 (admitted); Tr. I, 96–98 (testimony of George Dibrell).

15. Tr. I, 98 (testimony of George Dibrell).

16. A.J.S. ¶¶ 4, 101.

17. A.J.S. ¶¶ 4, 104.

18. A.J.S. ¶¶ 4, 105–08, 113.

19. See Exh. 122, 124.

20. Exh. 133, Part 20 at 7–8; Sadler Dep. I (October 24, 1980), 114–15.

21. A.J.S. ¶¶ 102–03; Tr. I, 28–29 (testimony of George Dibrell); Guidry Dep. 78; Sadler Dep. I, 184–85.

22. Exh. 148; Tr. I, 16–17 (testimony of George Dibrell); Hayes Dep. 10–11; Sadler Dep. I, 181–87.

23. Tr. I, 16–17 (testimony of George Dibrell); Guidry Dep. 79; Hayes Dep. 10–12; Sadler Dep. I, 181–85.

24. Tr. I, 99 (testimony of George Dibrell). See Exh. 122, 124.

25. Exh. 133, Part 8 at 24; Exh. 144.

out of the City into the surrounding townships.[26] Between 1960 and 1970, the non-black population in Port Arthur diminished from 46,145 to 34,377.[27] There is some suggestion in the record that the outmigration was motivated by the decreased hiring of the local oil refineries and the high cost of living in Port Arthur,[28] but these factors would have impacted on blacks as much as whites and there is no evidence that blacks were leaving the City. On the other hand, there was overwhelming testimony that the white exodus was prompted by racial considerations. A 1969 study commissioned by the municipal government revealed that the most frequent negative comment of Port Arthurians with respect to their home was "too many minority group members."[29] Mayor Bernis Sadler and the City's demographic expert, Lyle M. Vickers, both attributed the outward movement to the court-ordered desegregation of the schools in 1970.[30] In 1973, the Port Arthur City Council received another study from a Chicago-based consulting group, the Public Administration Service ("PAS"), which also concluded that race was a reason for the outmigration of whites.[31] Thus, since 1960, Port Arthur appears to have suffered a classic case of "white flight."

On December 29, 1974, the situation was exacerbated when a black youth named Clifford Coleman was shot to death by a white Port Arthur policeman while escaping from police custody.[32] Plaintiff asserts that Coleman was escaping from "jail" as opposed to "police custody." Semantics aside, it is undisputed that the black youth was being booked for using abusive language when he broke away from the police officer who shot him as he ran.[33] The level of racial tension in the City increased significantly following the incident, and, for the first time, there was a community-wide reaction to what was perceived as a racially discriminatory act.[34] The black population of Port Arthur conducted rallies, held marches and attended community-wide meetings. Several businesses were burned, and at least one family armed itself in preparation for a conflict.[35] More peaceful protests included the resignation of all the black members of the Port Arthur Chamber of Commerce and the refusal of a local black football star, Joe Washington, to accept an award from the Chamber.[36]

Although the tension level subsided somewhat in the years following the Coleman shooting, the effects of the incident continued to be felt in Port Arthur.[37] The municipal elections of April 2, 1977, for example, evidenced the unremitting racial hostility. Four council seats including that of the mayor were in contention, and in each race a white candidate confronted a black.[38] As part of their campaign effort against the slate of black candidates, members of the Port Arthur City Council placed a series of three full-page advertisements in the *Port Arthur News* on the three days preceding the election.[39] The ads warned about the efforts of the Rev. William Land "to rally the local black community to gain control of the city government." Specifically named as associates of Rev. Land were two black candidates; A. Z. McElroy was said to have brought him to Port Arthur and Paul

26. Evans Dep. 8–9, 12; Green Dep. 7–8; Sadler Dep. II (November 6, 1980), 7–11; Vickers Dep. II (October 23, 1980), 70–73.

27. A.J.S. ¶ 7; Exh. 95.

28. Evans Dep. 41–5; Sadler Dep. II, 7.

29. A.J.S. ¶ 31.

30. Sadler Dep. II, 7–8; Vickers Dep. II, 70–73.

31. Exh. 133, Part 8; Greisinger Dep. 19–20, 30.

32. U.S.P.F. ¶ 40 (admitted in part).

33. *See, e. g.*, Exh. 145 at 20; Evans Dep. 50–51.

34. A.J.S. ¶¶ 35–37; U.S.P.F. ¶¶ 41, 43 (admitted).

35. U.S.P.F. ¶ 42 (admitted); Scott Dep. 8.

36. A.J.S. ¶ 38; Spencer Dep. 26.

37. Evans Dep. 17–19, 53, 61; Hall Dep. 24; Huber Dep. 11–12; Sadler Dep. I, 101–02; Scott Dep. 10–11.

38. A.J.S. ¶¶ 39–40.

39. U.S.P.F. ¶ 55 (admitted); Exh. 9.

Strawder was allegedly president of his congregation. Plaintiff City of Port Arthur subsequently characterized these ads as admonitions of an "outside takeover," [40] but the language of the ads undeniably referred to a takeover by the local black community. Furthermore, each of the black councilmanic candidates in the 1977 election was a long-time resident of Port Arthur.[41] Only Rev. Land was an "outsider," but he was not running for office.

In the ensuing election, the black slate narrowly lost every race.[42] By all accounts, the election results reflected severely polarized racial bloc voting; the phenomenon which occurs when white citizens vote for white candidates and black citizens cast their ballots for blacks.[43]

### 3. Consolidation with Pear Ridge and Lakeview

Almost immediately after the councilmanic elections of April 2, 1977, there was considerable discussion of the idea of consolidating Port Arthur with the surrounding white communities. The economic and administrative need for such action had been recognized at least since the 1940's.[44] Between 1940 and 1950, the City annexed two areas in order to increase the municipal population, and the people of Port Arthur supported an unsuccessful effort to annex the area now known as the City of Groves. In the next decade, Port Arthur annexed several areas including Port Acres, El Vista, Fairlea, Highland Heights and Foster Estates. The City again voted to consolidate with Groves in 1959,[45] but that effort and a 1956–57 campaign to join Port Arthur with Pear Ridge, Lakeview and Griffing Park

failed. Among the factors motivating these efforts in the 1950's were the City's desires to increase its population for the 1960 Census, to facilitate construction of a seawall for the entire area, to improve streets and police and fire protection, and to attract business. Although the City continued its search for ways to increase its population, there was no expansion of the municipal boundaries between 1960 and 1970.[46]

In 1973, the Port Arthur City Council received the above-mentioned PAS report. Entitled "Intergovernmental Relations in the Greater Port Arthur Area," the study recommended that "the City of Port Arthur, and the surrounding municipalities should be consolidated to create a single governmental unit." [47] In order to accomplish such a reorganization, PAS counseled that "an intensive and deliberate effort to develop a broad consensus on the best available alternative to the status quo" was required. After this "painstaking research and proposal development," it would be necessary to enlist popular support by "a variety of promotional methods, suited to the diverse composition of the electorate."

By 1975, members of the Port Arthur City Council began receiving inquiries about consolidation from private individuals residing in neighboring communities.[48] Specifically, City Manager Dibrell was approached by Ernest Askew, a resident of Pear Ridge, several times beginning in 1975 and continuing through April, 1977. According to Mr. Askew, the rising sewer and water rates in Pear Ridge and the increasing taxes sparked interest in consolidation with Port Arthur around 1975 or 1976.[49] Ron Gates also relayed the sentiment in

**40.** U.S.P.F. ¶ 55 (admitted); Tr. I, 84–87 (testimony of George Dibrell).

**41.** Exh. 10; McElroy Dep. 4.

**42.** U.S.P.F. ¶ 56 (admitted); Exh. 8.

**43.** U.S.P.F. ¶ 56 (admitted); *See, e. g.*, Tr. I, 207–08 (testimony of Joseph Zimmerman); Cotrell Dep. 20–21; Davidson Dep. 12–13; McManus Dep. I (October 6, 1980), 45.

**44.** Exh. 16–17, 24; Tr. I, 12–15 (testimony of George Dibrell); Vickers Dep. I (October 6, 1980), 12–27.

**45.** Exh. 149.

**46.** Vickers Dep. I, 27–29.

**47.** Exh. 133, Part 8 at 67. *See also* A.J.S. ¶ 32.

**48.** Tr. I, 46–48, 108–09 (testimony of George Dibrell); Sadler Dep. I, 53, 224.

**49.** Askew Dep. 4–6.

Pear Ridge to Mr. Dibrell and Mayor Sadler in April, 1977, if not earlier. An inhabitant of Griffing Park, Brenda Drago, apparently contacted the City Manager and the Mayor sometime after 1975. Finally, there was testimony that a movement in favor of consolidation began in Lakeview after 1975.[50] At that time, Cecil Hamilton and Lewis Foster talked with Mayor Sadler.

Despite the unqualified recommendation of PAS and the urgings of residents from the surrounding townships, no action was taken by the Port Arthur municipal government. The PAS consulting group was not contacted again until the time of trial, nor was any other study of consolidation commissioned before May, 1977.[51] The subject of consolidation was not even mentioned in the official minutes of the Port Arthur City Council from March 8, 1976, to April 4, 1977.[52]

Once the results of the April 2, 1977, municipal elections were known, however, the Port Arthur City Council pursued the issue of consolidation vigorously. On April 11, 1977, at the very next regular meeting of the Council, the former mayor of Port Arthur, R. B. McCollum, informed the members that "it is essential to unite and consolidate now more than ever before."[53] Later in the month, Port Arthur Mayor Sadler and City Manager Dibrell took an unprecedented action[54] by arranging three separate meetings with members of the all-white Pear Ridge, Lakeview and Griffing Park city councils at the Holiday Motel Restaurant in order to discuss citizen interest in consolidation and to explain the benefits which would accrue.[55]

Whether or not the racial composition of Port Arthur and the political situation there were mentioned at those dinner meetings is the subject of considerable debate. Most of those who attended the meetings do not recall a discussion of the April 2, 1977, Port Arthur elections nor of race in general, however, several individuals remember references to the changing racial make-up of the City and the need to "stabilize" the population.[56] According to James Shaw, a member of the Griffing Park Council, Messrs. Sadler and Dibrell even declared that there was a possibility that blacks would take over the Port Arthur City Council,[57] but Mr. Dibrell later explained that such a statement, if any, related only to Rev. Land.[58] Recognizing that memory lapses with the passage of time and that many of these Town officials are "interested witnesses" with good reason to conceal the truth,[59] we conclude that there was some mention made of the racial situation in Port Arthur. Yet, we are not prepared to stand by the testimony of Mr. Shaw when no other witness corroborates it.[60] In

50. Hamilton Dep. 8–11, 14, 16–17, 23.

51. A.J.S. ¶ 33; Greisinger Dep. 32.

52. A.J.S. ¶ 41.

53. Exh. 130.

54. Hammond Dep. 12; Lindsey Dep. 43; Moser Dep. 24; Shaw Dep. 7.

55. A.J.S. ¶ 42; U.S.P.F. ¶ 60 (admitted); Beckom Dep. 36–41; Hammond Dep. 10; Kleespies Dep. 14–17; Lindsey Dep. 35–46.

56. Beckom Dep. 46–47, 49–50, 93; Goff Dep. 20; Kleespies Dep. 17; Shaw Dep. 10–11.

57. Shaw Dep. 11–15.

58. Tr. I, 76, 87 (testimony of George Dibrell).

59. As leaders of the predominantly white communities which stood to gain much by consolidation with Port Arthur and as participants in the actual consolidation drive, these individuals certainly qualify as "interested witnesses" whose testimony is to be discounted. *See City of Richmond v. United States*, 422 U.S. 358, 377 (1975); *Hale County v. United States*, 496 F.Supp. 1206, 1217 (D.D.C. 1980).

60. In their deposition testimony, Denise Hensley and Douglas Bedell, two reporters for the *Beaumont Enterprise*, also described statements allegedly made at the Hotel meetings by Mayor Sadler and City Manager Dibrell to the effect that consolidation was necessary in order to avert a black takeover of Port Arthur. *See also* Exh. 1, "Closed Talks Air South County Merger," *Beaumont Enterprise*, May 5, 1977, at 1. By Order of December 17, 1980, however, this Court held that the deposition testimony of Ms. Hensley and Mr. Bedell and the article in the *Beaumont Enterprise* authored by them contained hearsay which was inadmissible to prove the truth of the matter asserted. Therefore, Mr. Shaw's statements are effectively without corroboration in the record.

all probability, the Mayor and the City Manager merely made subtle reference to the racial composition of Port Arthur, but that was undoubtedly sufficient to remind the long-time residents of southern Jefferson County of the racial advantages of consolidation. Thus, race was included among the several factors cited at the dinner meetings in favor of a merger with the surrounding municipalities.

During the weeks which followed, Port Arthur officials participated in an active effort to provide information regarding consolidation to the surrounding municipalities because Texas law required the smaller city to first petition and vote for consolidation.[61] On May 9, 1977, the City Council authorized Mr. Dibrell to investigate the cities involved and to prepare a detailed statistical report on the cost of ·municipal services, local ad valorem taxes, home insurance costs, the positions and salaries of municipal employees, and other subjects.[62] The resulting "packet of information pertaining to the proposed consolidation" was then distributed in the neighboring communities.[63] It included a draft petition to be circulated in the affected township in order to initiate consolidation and a draft ordinance which would provide for the establishment of an advisory council from each of the three cities to the Port Arthur City Council. Throughout the summer months, Port Arthur City officials attended a series of public meetings in Pear Ridge, Lakeview and Griffing Park to provide explanations and additional information.[64]

Plaintiff City of Port Arthur offered the surrounding municipalities a series of inducements to consolidate. One of the principal attractions held out to the adjacent communities was Port Arthur's recently decreased tax rate.[65] Prior to 1977, the mu-

nicipal property tax on homeowners was significantly higher than that of its neighbors because the City Charter precluded the annexation of adjoining industrial properties. Port Arthurians amended the Charter in 1975, however, so as to permit the necessary annexations. By 1977, after the City had negotiated very favorable contracts involving substantially increased payments in lieu of taxes from the industrial property owners, the tax rate was greatly lowered. Therefore, it became possible for Port Arthur to promise the surrounding townships a reduction in their property taxes and a five-year freeze on the 1976 property assessments in use at the time.[66]

Consolidation also provided a vehicle for the neighboring areas to resolve various problems relating to water and sewage services.[67] For many years, each township had contracted with Port Arthur for these services, but legal disputes had developed over the prices charged. In addition, state and federal regulations implemented in 1976 required vast revisions to the water and sewer facilities in each city. Pear Ridge, Lakeview and Griffing Park did not have the financial resources to make the necessary capital improvements. Although Port Arthur had the funds with which to comply with the new regulations, it was unwilling to renew the disputed and disadvantageous service contracts. If the municipalities consolidated, however, Port Arthur would furnish the capital for the required improvements and would absorb by operation of Texas law the legal liabilities owed to it.

Other municipal services were offered to the three townships as part of the consolidation package. The deteriorating firefighting units in the outlying communities were to be joined with Port Arthur's full-

---

61. Plaintiff's Proposed Findings of Fact and Conclusions of Law ("P.P.F.") ¶¶ 13, 20 (admitted); U.S.P.F. ¶ 72 (admitted).

62. A.J.S. ¶ 46; Exh. 84.

63. U.S.P.F. ¶¶ 63–64 (admitted); Exh. 5.

64. A.J.S. ¶ 47.

65. Tr. I, 32–36 (testimony of George Dibrell); Sadler Dep. I, 208–11.

66. Exh. 5; Beckcom Dep. 94; Dibrell Dep. 84–88; Goff Dep. 9; Sadler Dep. I, 167–68.

67. A.J.S. ¶¶ 43–45; P.P.F. ¶¶ 10–12 (admitted); U.S.P.F. ¶¶ 68–69 (admitted in part); Tr. I, 36–39 (testimony of George Dibrell).

time professional fire department; the fragmented police protection was to be unified into a single, enlarged police force; and the public library was to be made available to everyone at no charge.[68] Little increase in cost was anticipated because of the location of existing fire stations and the size of the current police and firefighting forces. Without consolidation and an increased tax base, however, the City announced that it was not economically feasible to continue providing the above services.

Finally, Port Arthur City officials pledged that they would establish advisory councils to the City Council from Pear Ridge, Lakeview and Griffing Park.[69] For a five-year transition period commencing on the effective date of the consolidation, the elected members of these councils would have direct access to and influence on the decision-making process of the municipal government. Although individuals and groups from other areas of the City were free to contact members of the City Council, no official advisory councils were created to represent those areas.

The benefits of consolidation did not inure solely to the neighboring communities. Port Arthur, for example, was extremely interested in maintaining a population in excess of 50,000 so as to remain entitled as a matter of right to funds from federal agencies including the Department of Housing and Urban Development ("HUD").[70] Were the population to decrease below the 50,000 level, HUD would diminish the amount of the direct grant by one-third each year; in the fourth year, the City would have to complete with other applicants for discretionary awards. Since 1975, the City had automatically received almost $10,000,000 in federal grants, but there was evidence that the municipal population was approaching the 50,000 mark. Between 1960 and 1970, the number of Port Arthurians had declined from 66,676 to 57,371. Before the dinner meetings at the Holiday Motel, City officials were in receipt of an estimate from the Office of Revenue Sharing indicating that there were only 53,557 residents in 1976 and population data published by the R.L. Polk Co. for the years 1972–75. In order to ensure federal funding for the foreseeable future, Port Arthur sought to consolidate with the surrounding municipalities. Having already annexed all of the adjacent black communities, the City turned to Pear Ridge, Lakeview and Griffing Park.

An increase in population also had other advantages for Port Arthur. Although the City would be required to provide services to the new residents, it was anticipated that the additional cost would be minimal and greatly outweighed by the increased tax revenue. The City Manager suggested that the economies were so apparent that it was unnecessary to prepare a detailed cost-benefit analysis.[71] Furthermore, Port Arthur hoped that the increased visibility resulting from consolidation would attract new businesses and thereby create new jobs.[72]

In June, 1977, separate petitions calling for an election on the issue of consolidation with Port Arthur were circulated and signed by citizens of Pear Ridge, Lakeview and Griffing Park.[73] At the referenda elections held on August 13, 1977, a majority of the citizens in Pear Ridge and Lakeview voted for consolidation, but the residents of Griffing Park voted against it.[74] City officials of Port Arthur including Mayor Sadler then began campaigning for consolidation within the City.[75] By a vote of 6,449 to

68. A.J.S. ¶ 49; Tr. I, 52–4, 77–78 (testimony of George Dibrell); Sadler Dep. I, 60.

69. A.J.S. ¶ 48; Sadler Dep. I, 70–73.

70. P.P.F. ¶¶ 14–17 (admitted); Tr. I, 39–41 (testimony of George Dibrell); Vickers Dep. I, 34–39, 51–52.

71. Tr. I, 53–54 (testimony of George Dibrell); Dibrell Dep. 39–41, 102–03.

72. Exh. 3, 7, 48; Sadler Dep. I, 234; Spencer Dep. 19–20.

73. P.P.F. ¶ 21 (admitted).

74. A.J.S. ¶¶ 50–51.

75. U.S.P.F. ¶¶ 75–76 (admitted).

1,223, Port Arthurians approved consolidation with Pear Ridge in a referendum election held on November 8, 1977. At the same time, 6,353 residents of the City voted for consolidation with Lakeview, and 1,181 voted against it.[76] Although the white community almost unanimously supported the merger, black voters were divided on the issue; the election results did not evidence severe racial polarization.[77]

Certified copies of the results of the consolidation referenda held in Port Arthur, Pear Ridge and Lakeview were filed with the Texas Secretary of State on December 1, 1977, and the consolidation was officially consummated.[78] Henceforth, the City of Port Arthur was responsible for governing a population which was, according to 1980 census statistics, increased by 6,008 people including 80 blacks to a total of 60,493 of whom 24,710 or 40.85% were black and 3,825 or 6.32% were Hispanic.[79] The areas formerly known as Pear Ridge and Lakeview contributed over 16% of the whites in the enlarged community and less than 1% of the blacks.[80]

4. The 7–0–1 plan

On November 28, 1977, the Port Arthur City Council fulfilled its promise to the Pear Ridge and Lakeview electorate by adopting Ordinances 77–118 and 77–119 which established Pear Ridge and Lakeview Advisory Councils.[81] The City Council also assembled an Advisory Committee for Council Election System for the purpose of proposing changes in the manner of electing council members in view of the expansion of the City.[82] Thirteen local civic groups were selected to appoint two members each to the Election System Advisory Committee. Of the 26 people designated to serve on the Committee, only 7 were black and 2 were Hispanic.

The record suggests that the Advisory Committee for Council Election System was racially divided.[83] According to the statement in the Committee minutes by Rev. Ransom Howard and the testimony of other black committee members, the white members generally favored an at-large system while the blacks supported a single-member district plan. Eventually, the majority of the Committee recommended to the City Council that the at-large election system be continued and that a seventh councilmanic position be added to the existing six-member council ("7–0–1" plan). A minority report proposing the adoption of a single-member district plan was submitted to the Council by five of the seven black representatives on the Committee.

Plaintiff argues that the City Charter only permitted the Council to increase the number of seats from six to eight without changing the election system itself.[84] Fur-

76. A.J.S. ¶¶ 52–53.

77. Exh. 8, 170. According to plaintiff's expert, Dr. Susan McManus, the polarization scores for the special referendum election on consolidation with Pear Ridge and Lakeview were 56.3 and 56.4, respectively. Exh. 170. None of the expert witnesses who testified in this case would consider that level of racial polarization to be severe. See note 136 infra.

78. A.J.S. ¶ 56.

79. See note 5 supra.

80. In calculating the percentage of the white population which was added, we assumed that the City's Mexican-Americans were all included in the "white" population and, therefore, subtracted them out of the total population as well as the blacks. We recognize that our assumption is not well-founded, see note 5 supra, but it is preferable to utilize the most conservative

estimate. Two alternative methodologies produce somewhat greater percentages. If we simply use the numbers in the "white" category of the 1980 Census, it appears that Pear Ridge and Lakeview contributed 5,696 whites or 17.15% of the eventual total of 33,222. We might also have subtracted all of the City's minority population including American Indians, Asians, Hispanics, blacks and others from the total population; in that event, we conclude that 4,991 whites or 17.03% were added by the consolidation to make a total of 29,301 whites.

81. A.J.S. ¶ 55.

82. A.J.S. ¶¶ 54, 61–2.

83. A.J.S. ¶ 63; U.S.P.F. ¶ 94 (admitted); Exh. 53; Green Dep. 18–19; Scott Dep. 18–19.

84. See Exh. 133, Part 20 at 15.

thermore, the City claims that the addition of a seventh position was a valid effort to "increase minority representation."[85] These explanations, however, ignore the possibility of amending the Charter by means of a referendum election, and they do not justify the failure to read the minority report at the two public hearings held by the City Council on December 28, 1977, to discuss the Committee's recommendation.[86] Without attempting to answer these two questions, the Port Arthur City Council accepted the 7–0–1 plan recommended by the Council Election System Advisory Committee and enacted Ordinance 78–11 on January 16, 1978.[87] Subsequently, Ordinance 78–15 was adopted in order to make technical adjustments to certain residency district lines.

### 5. Annexation of Sabine Pass

Approximately six months after consolidation with Pear Ridge and Lakeview, the City of Port Arthur began to annex the area known as Sabine Pass, a separate unincorporated community located eight miles from the closest point in Port Arthur. In view of the problems encountered with the municipalities east of Port Arthur and the movement developing in Sabine Pass to incorporate, the Port Arthur City Council decided to annex the latter community.[88] The City had apparently planned to annex Sabine Pass about five years in the future for various economic and administrative reasons. Among the advantages cited by Port Arthur were obtaining a deep water port, sharing a common water supply, controlling offshore drilling activity, acquiring an area for industrial growth, and preventing fragmentation of jurisdiction.

By virtue of Ordinances 78–43, 78–47, 79–33, 79–34, and 79–67, Port Arthur's population increased by 501 including 31 blacks and 18 Hispanics according to the 1980 Census.[89] The City's total population advanced to 60,994 of whom 24,741 or 40.56% were black and 3,843 or 6.30% were of Spanish origin. Thus, since 1977, Port Arthur has enveloped within its borders 5,675 additional whites and 111 additional blacks who comprise 17.51% and 0.45% of the total number of individuals of their respective races in the enlarged City.[90]

### 6. The 8–0–1 plan

Not having held councilmanic elections since April 2, 1977, the City made another effort to develop an acceptable election system at the beginning of 1980. Exhausting its Charter authority, Port Arthur City Council enlarged itself so as to include nine members ("8–0–1" plan).[91] Eight members were required to reside in different districts, and each had to obtain a majority of the votes cast by all of the qualified voters in the "new" City. Their two-year terms were staggered so that four council members were chosen one year, and the four others were selected the next year. The mayor continued to be elected at large every other year.

The task of dividing the City into eight districts of nearly equal population was assigned to Lyle Vickers.[92] His purpose and that of the City Council was to draw districts "to the maximum extent possible to elect at least two black candidates to the

---

85. Exh. 53.

86. A.J.S. ¶¶ 65–66.

87. A.J.S. ¶ 73.

88. Tr. I, 63–64 (testimony of George Dibrell); Sadler Dep. II, 20–21, II, 45–47.

89. A.J.S. ¶ 67. See note 5 supra.

90. As explained in note 80 supra, the number of white citizens can be derived in several ways from the 1980 Census statistics. The figures appearing in the text were once again obtained by subtracting all Mexican-American and black individuals from the total population. The first alternative method described in note 80 indicates that 6,163 or 18.29% of the total "whites" in the expanded area reside in the newly acquired regions. According to the second alternative, 5,440 whites, constituting 18.23% of the new total of 29,840, have been absorbed by Port Arthur.

91. A.J.S. ¶ 76.

92. Vickers Dep. I, 43–44, 53, 83; II, 6.

Council, and with a third candidate being elected as the population continues to shift east ... by 1984 or 1985." Using 1970 Census VAP data and considering the "electability of [particular] people, either current Councilmen or people off the Council," Vickers proposed the following districts: [93]

| District | Total Population | | | Voting Age Population | | |
|---|---|---|---|---|---|---|
| | Total | Black | % Black | Total | Black | % Black |
| 1 | 8,289 | 3,694 | 44.58% | 5,382 | 2,094 | 38.91% |
| 2 | 8,216 | 10 | 00.12% | 5,879 | 6 | 00.10% |
| 3 | 7,474 | 844 | 11.29% | 5,223 | 478 | 09.15% |
| 4 | 7,983 | 1,045 | 13.09% | 5,558 | 592 | 10.65% |
| 5 | 9,065 | 8,735 | 96.35% | 5,186 | 4,951 | 95.46% |
| 6 | 8,317 | 5 | 00.06% | 5,952 | 3 | 00.05% |
| 7 | 9,761 | 8,305 | 85.05% | 5,751 | 4,707 | 81.84% |
| 8 | 7,023 | 563 | 08.02% | 4,942 | 319 | 06.45% |

This plan was adopted on January 21, 1980, when the City Council enacted Ordinance 80–02.

### 7. The 4–4–1 plan

In the early months of 1980, Port Arthurians were unable to agree upon a mutually acceptable election plan for the City Council. The Port Arthur firefighters' union presented an alternative election system in April in an effort to resolve the impasse so that a referendum on a collective bargaining agreement could be held.[94] Intending to "provide for the election of minorities in numbers approximately equal to their number in the population," [95] the firemen proposed a plan in which six members of a nine-member city council would be elected from single-member districts and the other two members would be elected by at-large vote with the mayor ("2–6–1" plan).[96] To implement this plan, it was necessary to amend the City Charter by means of a referendum election called upon petition of 5% of the number of voters at the last general election.[97] The firefighters therefore launched a petition drive to place the 2–6–1 plan on a special ballot.

The members of the City Council and certain white citizens, however, were adamant in their insistence upon the election of all council members by at-large vote.[98] Mayor Sadler, for example, accused the firefighters of "trying to take over the City" and voiced strong opposition to the concept of the 2–6–1 plan.[99] On the other hand, certain black citizens including intervenor-defendants continued to advocate the adoption of a pure single-member district election system.[100]

Consequently, when the Community Relations Service of the United States Department of Justice ("CRS") offered to mediate the settlement of these differences, the interested parties quickly accepted.[101] The City chose a team composed only of whites to represent it, and there is some evidence to suggest that members of the City's team perceived their role as representing the white citizens of Port Arthur.[102] A second team was established to represent the black

---

**93.** Exh. 115. The parties have not presented the Court with an analysis of the 8–0–1 plan based on more recent population data.

**94.** Avery Dep. 6–10.

**95.** *Id.* at 13.

**96.** A.J.S. ¶ 79.

**97.** A.J.S. ¶ 115.

**98.** P.P.F. ¶ 41 (admitted).

**99.** Avery Dep. 33–34; Sadler Dep. I, 84, 86.

**100.** P.P.F. ¶ 41 (admitted); Tr. II, 120, 122, 124 (testimony of Walter Mosely); Avery Dep. 19.

**101.** A.J.S. ¶ 80; Tr. I, 43 (testimony of George Dibrell); Avery Dep. 39–41.

**102.** A.J.S. ¶ 80; Dickinson Dep. I (October 6, 1980), 11.

community.[103] Although the firefighters were originally invited to participate, they were later excluded because the City refused to negotiate with people who worked for the City; Mayor Sadler asserted that this would be in "the best interest of my general public" and that the firemen were needed to fight fires.[104]

Between April 28 and June 18, 1980, the City's team and the black team met several times.[105] Initially, the white team supported the election of all council members by at-large vote, and the black team favored a single-member district system. No agreement was reached, however, on these plans or several other alternatives. At approximately the same time that the firefighters were presenting to the City Council their petition requesting a referendum election on the 2–6–1 plan, the mediation team representing the black community made a final suggestion that the 2–6–1 plan be adopted. Because that plan involved too few at-large seats, the white team rejected it.[106]

The City's team countered with a proposal described as "the bottom line."[107] It provided for a nine-member council including a mayor who continued to be elected at-large. Four council members would be elected from single-member districts. These same districts would also serve as residency districts for the four remaining members who would be elected on an at-large basis ("4–4–1 plan").

In formulating this plan, Lyle Vickers allegedly sought to minimize population deviations among districts and to develop compact districts.[108] The information available at the time indicated that the population of each district was as follows: [109]

| District | Total Population | | |
|---|---|---|---|
| | Total | Black | % Black |
| 1 | 15,020 | 12,651 | 84.23% |
| 2 | 15,181 | 1,895 | 12.48% |
| 3 | 14,982 | 1,027 | 06.85% |
| 4 | 16,185 | 9,711 | 63.95% |

**103.** A.J.S. ¶ 80. *According to the trial testimony* of Walter Mosely, the original black team reorganized as the "Green team" after Mr. Mosely criticized some of its members, and it excluded Messrs. Mosely and Lewis. Thereupon, those two men convened a public meeting of representatives from various community organizations in order to elect members of the "Elected Black Mediation Team." After some discussion of the possibility of trilateral negotiations, Mr. Robert Greenwald, the CRS mediator, determined that the proceedings should be limited to two teams, the City's team and the group of black citizens known as the "Green team." The Elected Black Mediation Team continued to participate in the mediation effort as a consultant to the Green team. *See* Exh. 139; Tr. II, 115–17 (testimony of Walter Mosely).

**104.** Avery Dep. 39–41; Sadler Dep. I, 84.

**105.** A.J.S. ¶ 81; P.P.F. ¶ 42 (admitted). Our knowledge of the discussions at these meetings is somewhat deficient because of our decision to quash the discovery subpoena served upon Mr. Greenwald. *See* Order of November 12, 1980. Other participants in the mediation process, however, have testified extensively on the subject.

**106.** P.P.F. ¶ 44 (admitted); Tr. II, 120–21 (testimony of Walter Mosely).

**107.** A.J.S. ¶ 82; P.P.F. ¶¶ 44–45 (admitted); Dibrell Dep. 51–52.

**108.** P.P.F. ¶ 55 (admitted); Vickers Dep. I, 102.

**109.** Exh. 15. Vickers used 1970 Census statistics updated by annual "block statistics" furnished by the R.L. Polk Co. and data from the City's Community Development Department. *See* P.P.F. ¶ 56 (admitted). The only VAP information available then or now was that derived from the 1970 Census:

| District | Total Population | | | Voting Age Population | | |
|---|---|---|---|---|---|---|
| | Total | Black | % Black | Total | Black | % Black |
| 1 | 19,160 | 12,945 | 67.55% | 11,786 | 7,337 | 62.24% |
| 2 | 15,307 | 117 | 00.80% | 10,937 | 66 | 00.63% |
| 3 | 15,208 | 153 | 01.00% | 10,862 | 87 | 00.79% |
| 4 | 16,453 | 9,987 | 60.70% | 10,287 | 5,660 | 54.98% |

*See* Exh. 114.

More recently, the 1980 Census disclosed that the four proposed districts contain the following number of inhabitants: [110]

| District | Total Population | | |
|---|---|---|---|
| | Total | Black | % Black |
| 1 | 14,649 | 11,846 | 80.86% |
| 2 | 15,855 | 3,141 | 19.81% |
| 3 | 16,033 | 919 | 05.73% |
| 4 | 14,457 | 8,835 | 61.11% |

When the black mediation team decided that the 4–4–1 plan did not provide the minority community representation proportionate to its electoral strength, it rejected the City's final proposal and the negotiations broke down.[111] That night, six of the nine members of the City's mediation team formed a committee known as the Citizens' Committee for a Fair Electoral System to plan a petition drive for the purpose of presenting the voters with the 4–4–1 plan as an alternative to the 2–6–1 plan in the special referendum election.[112] Although City Attorney George Wikoff, City Manager George Dibrell and Lyle Vickers were not involved in the Citizens' Committee,[113] the municipal government offered its resources to the proponents of the 4–4–1 plan. The original of the Committee's petition to put the 4–4–1 plan on the ballot was typed in the City Attorney's Office, the instructions for the person circulating the petitions were typed in the Mayor's office, and the script for the radio ad promoting the 4–4–1 plan was written by the Port Arthur Director of Public Information.[114]

Throughout the campaign, the Citizens' Committee emphasized that adoption of the 4–4–1 plan would "keep our city government in the hands of *all* people." [115] This theme was continually repeated, for example, in a brochure distributed by the Committee which juxtaposed the virtually all-white members of the Committee and City Council who supported the 4–4–1 plan and "a certain group of the Port Arthur firemen" who favored the 2–6–1 plan along with Walter Mosely and Rev. C. O. Hall, two prominent black leaders.[116] In order to justify the abandonment of the pure at-large system, the author of the brochure first claimed that the 4–4–1 plan was an effort "to meet minority political interests (black and Hispanic) with the general interests of the citizenry in a sound and balanced government" and then reminded the reader that he/she would be entitled to vote for six of the nine council seats.

In the referendum election on the two proposed electoral systems held on August 9, 1980, the 4–4–1 plan was approved by a majority of the voters while the 2–6–1 plan was opposed by a majority of the voters in a separate contest.[117] Whites and blacks generally opposed each other at the polls; almost three-quarters of the white voters favored the 4–4–1 plan, and nearly all black Port Arthurians voted against it.[118]

### C. History of Blacks in Port Arthur

 The City of Port Arthur has a long history of discrimination against its black citizens.[119] Until the mid-1960's,

---

110. Defendant's Request to Take Judicial Notice at 3.

111. A.J.S. ¶ 81; P.P.F. ¶ 45 (admitted); Tr. II, 119 (testimony of Walter Mosely); Green Dep. 21–24; Scott Dep. 28.

112. A.J.S. ¶ 82; Dickinson Dep. I, 12.

113. A.J.S. ¶ 82.

114. Dickinson Dep. I, 6, 38; Sadler Dep. I, 89–90.

115. Exh. 41, 55–56.

116. Exh. 41.

117. A.J.S. ¶ 83.

118. Exh. 172; McManus Dep. II (November 23, 1980), 71–73. The actual racial polarization score with respect to the election on the 4–4–1 plan was 66. Although not "extreme," that score reflects a significant degree of racial polarization. *See* note 136 *infra*.

119. Plaintiff has filed a plea of collateral estoppel against the intervenor-defendants so as to foreclose relitigation of certain issues relating to the history of black Port Arthurians which were previously adjudicated in *Mosely v. Sadler*, 469 F.Supp. 563 (E.D.Tex.1979). In that action, four black citizens sued the mayor and other officials of Port Arthur claiming that the existing at-large election system violated the fourteenth and fifteenth amendments to the United States Constitution. Judge Steger made extensive findings of fact concerning racial po-

black citizens were subject to official discrimination under the so-called Jim Crow laws.[120] Segregation persisted in the City's schools until 1970, and the issue of desegregation is still the source of considerable racial tension.[121]

The black community has also suffered from residential segregation and the accompanying problems. As mentioned above, Port Arthur's blacks were essentially confined to the area west of Houston Avenue until 1957.[122] Although blacks were then

larization, black participation in the political process, and municipal responsiveness to black needs in the areas of employment and city services. Arguing that it is "in privity" with the defendants and that the current intervenors were party-plaintiffs in that suit, plaintiff City of Port Arthur now contends that those issues should not be relitigated. Furthermore, plaintiff maintains that the issues in question were fully and fairly litigated and decided adversely to the intervenors.

Neither the intervenor-defendants nor the defendant United States has filed a statement in opposition to plaintiff's plea. Nevertheless, the Court is inclined to deny plaintiff's request for the following reasons. First and foremost, we find that the non-participation of the United States in the previous litigation is fatal to the operation of estoppel in this case. The essence of collateral estoppel by judgment is that some question or fact in dispute has been judicially and finally determined by a court of competent jurisdiction *between the same parties or their privies.* 1B Moore's Federal Practice ¶ 0.441[2] (2d ed. 1980) (emphasis added). *See Harris v. Washington,* 404 U.S. 55, 57, 92 S.Ct. 183, 184, 30 L.Ed.2d 212 (1971); *Association of Bituminous Contractors, Inc. v. Andrus,* 581 F.2d 853, 860 (D.C.Cir.1978); *Laughlin v. U.S.,* 474 F.2d 444 (D.C.Cir.1972), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2784, 37 L.Ed.2d 402, *rehearing denied,* 414 U.S. 882, 94 S.Ct. 169, 38 L.Ed.2d 130 (1973); *Inmates, D.C. Jail v. Jackson,* 416 F.Supp. 119, 120 (D.D.C.1976). The requirement of identity of parties is justified by the ancient doctrine that a person cannot be bound by a judgment unless he has had reasonable notice of the claim against him and an opportunity to be heard in opposition to that claim; due process requires no less. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 330, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971); 1B Moore's Federal Practice ¶ 0.411[1] (2d ed. 1980).

Plaintiff has not alleged and there is no reason to believe that the four individual plaintiffs in *Mosely v. Sadler* were or are in privity with the United States. In fact, only two of the present intervenor-defendants were parties in the previous litigation. *See* Tr. II, 114 (testimony of Walter Mosely). Therefore, as the Supreme Court did in *City of Richmond, Virginia v. United States,* 422 U.S. 358, 370, 373 n.6, 95 S.Ct. 2296, 2303, 2305 n.6, 45 L.Ed.2d 245 (1975), we must decline to apply the doctrine of estoppel. That case involved a situation nearly

identical to the instant one. The presence of black intervenors who had lost an earlier constitutional challenge to an annexation did not estop relitigation of the question of discriminatory purpose because of the absence of the United States from the first suit. Other courts have refused to bar the United States from bringing actions under the Voting Rights Act when individual plaintiffs have previously failed. *See, e. g., United States v. East Baton Rouge Parish School Board,* 594 F.2d 56 (5th Cir. 1979); *United States v. State of Texas,* 430 F.Supp. 920 (S.D.Tex.1977).

The second reason that the Court must deny Port Arthur's plea is that the burden of proof in *Mosely v. Sadler* was precisely the reverse of that which exists in the instant case. Two of the current intervenor-defendants challenged the at-large election system on constitutional grounds in the earlier case, and, consequently, they bore the burden of proof. In the case at bar, the burden falls squarely on the plaintiff City to demonstrate that the proposed voting changes do not have a discriminatory purpose or effect. *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

Finally, we observe that the racial situation in Port Arthur and its environs has been the subject of previous litigation not once but twice in recent times. Prior to the decision in *Mosely v. Sadler,* another three-judge district court concluded that "though all of Texas has to some degree suffered the blight of racial discrimination, the attempts of the black community in Jefferson County to eliminate the vestiges of slavery have been met by particular turbulence, animosity, and recalcitrance." *Graves v. Barnes,* 378 F.Supp. 640, 648 (W.D.Tex. 1974), *remanded on other grounds,* 422 U.S. 935, 95 S.Ct. 2670, 45 L.Ed.2d 662 (1975). Although there is authority that the conclusiveness of a prior judgment is not affected by the fact that it may be incorrect, we feel compelled to review the facts once again in view of the inconsistent results reached by the two Texas courts on quite similar issues.

120. Sadler Dep. I, 129, 241.

121. Evans Dep. 64; Freeman Dep. 7; Sadler Dep. I, 102; II, 7.

122. *See* text accompanying notes 12 & 13.

pushed across that boundary by urban renewal developments, the black community remains concentrated in the western portion of the City.[123] In addition, it is undisputed that the areas of Port Arthur which are heavily populated by blacks are most in need of municipal improvements.[124] The disparate treatment of black and white citizens is perhaps underscored by the relocation of the municipal library from the downtown area where it was easily accessible to most minority members closer to the predominantly white New Town/In Town development; the new civic center was also built in the same area.[125]

The City has similarly performed poorly with respect to minority employment.[126] Although blacks constituted 33.5% of the municipal work force in 1973, almost nine-tenths of these black employees were skilled craftsmen and service maintenance workers. Very few blacks held middle and upper level jobs. In fact, at that time, no black employee earned over $10,000 per year while 36 whites received salaries in excess of that amount. The situation has improved only slightly since 1973. In 1980, blacks comprised 39.9% of the workforce, but 81% of those workers still held crafts and maintenance positions. Salaries of $16,000 per year or more were received by 257 non-blacks, but only 24 blacks were as highly paid.

It is also significant that there has been a disproportionately low number of black appointees to Port Arthur's boards and commissions.[127] In 1977, blacks filled only 31.3% of the available posts despite the fact that the City was nearly 45% black. Two years later, only 24.5% of the appointments were held by blacks. Furthermore, as the intervenor-defendants observed, "a significant number of the politically active black citizens that have appeared throughout this case do not appear on the list, while a few have been tapped for double and triple duty." [128]

Black Port Arthurians have fared even less well with respect to elected positions. Although blacks have been voting in municipal elections at least since 1931,[129] have regularly turned out to vote,[130] and have offered numerous candidates for office; [131] few blacks have actually been elected. Under the at-large system which existed prior to 1954, no blacks were ever elected to the seven-member commission even though they constituted 24.24% of the total population and 23.1% of the VAP in 1950.[132] Despite the institution of the single-member district plan and the increasing size of the black community, only five black men were elected to the City Council between 1954 and 1963.[133] Furthermore, there was never more than one black, the representative from District 1, on the six-member council at any given time.

Since 1963 when the 6–0–1 plan was implemented, no black candidate has ever won a councilmanic seat in Port Arthur when confronted by a white.[134] The poor performance of black candidates with white opponents is largely attributable to racially polarized voting. Plaintiff does not dispute the fact that most of the elections following

**123.** *Id.*; Green Dep. 6.

**124.** Exh. 71; Dibrell Dep. 11–17.

**125.** Hall Dep. 27.

**126.** Exh. 73, 136; Dibrell Dep. 24–26.

**127.** Exh. 135.

**128.** Defendant Intervenors' Post-Trial Brief at 17 (filed December 29, 1980).

**129.** Sadler Dep. I, 218–19; II, 13. *See also* Evans Dep. 14; Freeman Dep. 14; McManus Dep. II, 46.

**130.** Evans Dep. 47–48; McManus Dep. II, 45.

**131.** Cotrell Dep. 55, 57; Davidson Dep. 10. Blacks have vied for office in 30 races between 1963 and 1977; 19 different black individuals were involved.

**132.** A.J.S. ¶¶ 5–6; Guidry Dep. 6.

**133.** Tr. I, 28 (testimony of George Dibrell); Guidry Dep. 5, 8–9; Sadler Dep. I, 130.

**134.** Tr. I, 135 (testimony of George Dibrell); Tr. II, 29 (testimony of Charles Cotrell); McManus Dep. II, 89.

the December, 1974, Coleman incident have been characterized by severe racial polarization,[135] but the Court finds that this situation has existed at least since 1969.[136] Our

135. Tr. I, 207–08 (testimony of Joseph Zimmerman); McManus Dep. I, 45, 67–68; II, 46–47.

136. Several experts testified on the issue of racial polarization. Each witness derived an arithmetical polarization score from black versus white councilmanic election results by identifying the 90% black precincts and the 90% white precincts, determining the percentage of votes cast in the black precincts for a particular candidate, and then subtracting the percentage of votes cast for the same individual in the white precincts. Tr. II, 9 (testimony of Charles Cotrell); Davidson Dep. 12–13; McManus Dep. II, 49. In the twelve black versus white contests which Dr. Charles Cotrell identified from 1969 through 1977, the black candidate never defeated his white opponent and only 9.21% of the voters in the black precincts supported the eventual white victor. Tr. II, 11. Dr. Cotrell considered the 82.6 average polarization score which he deduced from the returns to reflect "striking" polarization because other political scientists have declared racial polarization to exist where the scores were in excess of 50 or 60. Tr. II, 10–12. A similar analysis of Port Arthur councilmanic election returns between 1963 and 1977 by Mr. F. Chandler Davidson produced an average racial polarization index of 84. Davidson Dep. 15.

Mr. Davidson did not study the contests in which a white candidate faced another white, but Dr. Cotrell did review the eleven elections of this variety which were held between 1969 and 1977 and discovered that blacks and whites alike voted for the same candidate in similar proportions in eight of the races. This voting behavior of the black population contrasted sharply with that exhibited in the black versus white contests and, therefore, supported Dr. Cotrell's conclusion that race was the polarizing factor in the latter case. Tr. II, 12–13, 64–69.

Testifying on behalf of the City, Dr. Susan McManus challenged the opinions expressed by Dr. Cotrell and Mr. Davidson. She argued in convincing fashion that their technique of averaging polarization scores for numerous elections is methodologically incorrect because "it ignores trends, . . . individual races, . . . campaign differentials, . . . voting turnout differentials, . . . [and] specific historical events." McManus Dep. II, 4–5. Nevertheless, the validity of the averaging technique in the instant case is clearly demonstrated by an inspection of the polarization scores for the twelve individual black versus white councilmanic elections held between 1971 and 1977. See Exh. 170; McManus Dep. II, 71–73. Nine of the twelve scores exceeded 80, and the only score to fall below 75 was the 63.2 index assigned to the 1977 mayoral race. Dr. McManus also reproached Mr. Davidson for combining whites and Hispanics when he selected those precincts

which were over 90% "white". McManus Dep. II, 47. Although this criticism may be technically correct, it is rendered insignificant when one recalls that the 90% figure is merely an arbitrary threshold which approached the ideal 100% level. Finally, Dr. McManus charged that Mr. Davidson's method of excluding races in which black candidates did not run was "unaccepted". McManus Dep. II, 41. Dr. Cotrell, however, reached a conclusion very similar to that of Mr. Davidson by means of a technique in which all councilmanic elections were considered. See Tr. II, 7–13.

In an independent study of electoral behavior in Port Arthur between 1969 and 1978, Dr. McManus reported that racially polarized voting was only present in the 1975 election for the mayor and Council and the 1977 election for the Council; only these races had polarization indices in excess of 90, the score which Dr. McManus required. McManus Dep. I, 45–46; II, 50–51. Although the 1977 consolidation referenda had polarization scores of 56, the 1977 mayoral election had a score of 66, the 4–4–1 referenda had a score of 66, and earlier councilmanic elections to have been polarized. McManus Dep. I, 45; II, 46–47, 50, 61–62, 64–65, 73–74, 119. Her analysis of these results was that "racial polarization in council elections is not attributable to the current electoral system, but to a specific incident involving Port Arthur police in 1975" which generated an anti-incumbent animus among black voters. Exh. 170; McManus Dep. I, 65–67; II, 46, 68.

The testimony of Dr. McManus, however, fails to withstand scrutiny. While she insisted on direct examination that any polarization score below 90 was not indicative of significant racially polarized voting, Dr. McManus admitted on cross-examination that she had used a threshold polarization score of 75 to determine "highly significant" polarization in a study relating to the City of Houston. McManus Dep. II, 53–59. According to her own figures, eleven of twelve black versus white contests between 1969 and 1977 evidenced "highly significant" polarization if the threshold is fixed at 75. The low score in the twelfth race, the 1977 mayoral election, can be attributed to Dr. McManus' method of analyzing multi-candidate contests, see McManus Dep. II, 68–70, and perhaps the relatively low polarization scores in the so-called issue elections concerning consolidation and the 4–4–1 plan are best explained by the imperfect identification of issues with skin color in the eyes of the electorate. Finally, we are not unaware that other factors such as incumbency affect the outcome of elections, but we cannot agree with plaintiff's broad statement that "incumbency is a far more decisive factor to election than race." Post-Trial Reply Brief of City of Port Arthur at 2 (filed December 31, 1980). In highly polarized black versus white contests, incumbency is only important to

conclusion is not surprising in view of the long history of hostility between black and white Port Arthurians which has manifested itself in the form of discrimination, white flight, and, more recently, black political activism.

Although a black has not defeated a white in a councilmanic election since 1963, a single black, Arthur Guidry, has continuously served on the City Council from that time to the present.[137] Mr. Guidry first ran at large in 1963 as an incumbent carry-over from the single-member district system, and he has only faced black opponents. In recent years, he has won reelection without a majority of the black votes only because he enjoys the support of the City's white community. Finally, with respect to the contests after 1963 which involved only white candidates, we note that the black citizens of Port Arthur have been unable to wield a so-called "swing vote;" the black population has been unable to influence the outcome of the race by rallying behind one of the two white contestants.[138]

### D. History of Mexican-Americans in Port Arthur

Originally, the Hispanic population of Port Arthur was concentrated in an area west of Houston Avenue known as "the colonial", but plaintiff contends that it has since dispersed throughout the City.[139] In support of this assertion, the City directs our attention to the 1970 Census which revealed that fifteen of the twenty-one Census tracts comprising Port Arthur each included over 100 Mexican-Americans and that only one tract contained none.[140] Nevertheless, there is persuasive evidence that the Hispanic community may not be evenly distributed today. According to the 1980 Census statistics, Mexican-Americans accounted for 17.60% of the inhabitants of tract 52 whereas tract 58 included only one person of Spanish origin. The greatest number of Mexican-Americans apparently live in the area designated as tracts 54–56 and 63–68 which is east of Houston Avenue and west of Groves. Plaintiff curiously admitted as much by circling tract 65 and labelling it "Hispanic concentration" on a map presented to the Attorney General in conjunction with the City's 1979 application for preclearance under section 5 of the Voting Rights Act.[141]

The testimony relating to other aspects of the lives of Port Arthur's Mexican-Americans is somewhat sparse. However, with respect to electoral politics, it appears that they have been afforded the opportunity to participate fully.[142] Yet, few, if any, Hispanic citizens have actually run for office, and no Mexican-American has ever won a position on the Port Arthur City Council.[143] In addition, there is no evidence that the individuals of Spanish origin have voted or will vote as a block. On the issue of at-large versus single-member district electoral systems, for example, there was testimony that most Mexican-Americans in Texas favor the latter, but neither Mr. Flores nor Mr. Silva, two Hispanic residents of the Port Arthur metropolitan area, supported the ward system.[144]

### E. Procedural History

The instant litigation was initiated by a letter from the City of Port Arthur received by the Attorney General on January 21, 1978, which requested preclearance under section 5 of the Voting Rights Act for the voting changes occasioned by the consolida-

---

white voters and only insofar as the incumbent is white.

**137.** U.S.P.F. ¶ 97 (admitted); Exh. 8; Tr. II, 13, 29 (testimony of Charles Cotrell).

**138.** Tr. II, 64–65 (testimony of Charles Cotrell). Of the eleven elections in which a white candidate faced another white between 1969 and 1977, only two were decided by the black vote. Tr. II, 12–13, 64–69 (testimony of Charles Cotrell).

**139.** Flores Dep. 14; Sadler Dep. I, 220; Silva Dep. 24.

**140.** Vickers Dep. I, 50.

**141.** Exh. 133, Part 23.

**142.** Flores Dep. 19; Sadler Dep. I, 219–20.

**143.** Flores Dep. 17–18; McManus Dep. I, 86.

**144.** Flores Dep. 20, 22; Silva Dep. 30–31, 36.

tion with Pear Ridge and Lakeview and the adoption of the 7–0–1 plan.[145] Within sixty days, the Attorney General interposed a timely objection denying preclearance because the consolidation significantly diluted black voting strength and the 7–0–1 plan did not sufficiently minimize the discriminatory impact of this dilution.[146] "Should the City of Port Arthur undertake to elect members of its city council from fairly-drawn single-member districts," however, the Department of Justice offered to reconsider its objection.

While the application for preclearance was under consideration, Port Arthur attempted to implement the unapproved voting changes. Consequently, four black Port Arthurians, including the intervenor-defendants Walter Mosely and Willie Lewis, obtained an injunction against the City from a three-judge federal court in Texas. *Mosely v. Sadler*, No. B–78–69–CA (E.D. Tex. March 27, 1979). The complaint also challenged the at-large voting plan on fourteenth and fifteenth amendment grounds, but the court found no such violation.[147] *Mosely v. Sadler*, 469 F.Supp. 563 (E.D.Tex. 1979).

As permitted by the Procedures for the Administration of Section 5, 28 C.F.R. 21.-51(b), 51.23 and 51.24, the City requested that the Attorney General reconsider his objections to the consolidation and the 7–0–1 plan. In addition, plaintiff submitted the annexation of Sabine Pass and the 8–0–1 plan for preclearance. On March 5, 1980, within thirty days after receipt of the request, the Attorney General declined to withdraw the earlier objections or approve the 8–0–1 plan because Port Arthur had not adopted a fairly-drawn single-member district plan as recommended.[148] The annexation of Sabine Pass was also disapproved because it merely "exacerbated the dilution of minority voting strength caused by the earlier consolidation." Noting the lengthy

delay which had occurred since the first objection had been interposed, the Attorney General ordered the City to notify his office within seven days as to what steps it was willing to take to obtain a withdrawal of the initial objection and the present objection and to obtain preclearance of the ordinances establishing advisory councils. On March 12, 1980, the City of Port Arthur responded by filing the complaint which resulted in the instant suit.

Subsequently, the citizens of Port Arthur attempted to reach an agreement on a new election system through the CRS mediation program. When the negotiations broke down, the City Council was presented with two petitions requesting a special Charter change election on the 2–6–1 and the 4–4–1 plans. Before the referendum was held, however, the United States Department of Justice filed suit before a three-judge federal district court in the Eastern District of Texas seeking an injunction against it. Although the Texas court permitted the City to proceed with the election, it reserved decision on the "legal effectiveness" thereof. *United States of America v. City of Port Arthur*, No. B–80–216–CA (E.D.Tex. July 24, 1980).

On August 9, 1980, the inhabitants of the enlarged City voted in favor of amending the City Charter by substituting the 4–4–1 plan for the existing electoral scheme. The same three judges who had previously denied the injunction against the election then granted the City authority "to declare the results of the referendum election and to certify the City Charter amendment for the *sole* and *limited* purpose of complete submission to the United States District Court for the District of Columbia before which the City's declaratory judgment action is now pending." *United States of America v. City of Port Arthur*, No. B–80–216–CA (E.D.Tex. Sept. 5, 1980). Accordingly, the complaint before us was amended so that it

145. A.J.S. ¶ 74.

146. A.J.S. ¶ 75; Exh. 109.

147. The decision of the Texas court with respect to the constitutional issue is not relevant

to an action brought under the Voting Rights Act. *See City of Dallas v. United States*, C.A. No. 78–1666 (D.D.C. May 5, 1979).

148. A.J.S. ¶ 78; Exh. 110.

now includes three counts: Count I seeks a declaratory judgment that the 8–0–1 plan, in the context of the consolidation with Pear Ridge and Lakeview and the annexation of Sabine Pass, is without discriminatory purpose and effect; Count II asks for a declaration to the same effect with respect to the 4–4–1 plan; and Count III requests a declaratory judgment that the establishment of advisory councils from Pear Ridge and Lakeview is not a voting change within the scope of section 5 and, if it is, that it did not have an illicit purpose or effect.

## II. CONCLUSIONS OF LAW

■ In 1965, Congress enacted the Voting Rights Act, 42 U.S.C. §§ 1973–1973p (1974) (amended 1975), "to rid the country of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966). This purpose was accomplished in part by the remedy set forth in section 5, 42 U.S.C. § 1973c, the suspension of all new voting regulations pending review by federal authorities to determine whether their use would perpetuate voting discrimination. Under section 5, a "State or political subdivision" determined to be within the coverage of the Act after November 1, 1972, may not "enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972," unless such change has been precleared by the Attorney General or unless the State or subdivision obtains a declaratory judgment from a three-judge panel of the United States District Court for the District of Columbia that such change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color" or membership in a protected language minority group. 42 U.S.C. § 1973c. *See South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

■ Exercising the jurisdiction vested in this Court by section 5, we initially determine that plaintiff City of Port Arthur is subject to the strictures of that provision.

The Voting Rights Act was declared applicable to the State of Texas in 1975, *Briscoe v. Bell*, 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977); 40 Fed.Reg. 43746 (Sept. 23, 1975), and it is well established that political units within covered jurisdictions must comply with the preclearance requirement of section 5. *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 1554, 1556, 64 L.Ed.2d 119 (1980); *United States v. Board of Commissioners of Sheffield, Alabama*, 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978).

■ Furthermore, it is clear that all of the electoral changes for which plaintiff seeks approval come within the purview of the Act. The Supreme Court has repeatedly held that altering boundary lines by annexations or consolidations which enlarge the city's number of eligible voters constitutes the change of a "standard, practice, or procedure with respect to voting." *See, e. g., City of Rome*, 100 S.Ct. at 1554; *City of Richmond v. United States*, 422 U.S. 358, 367–68, 95 S.Ct. 2296, 2302–03, 45 L.Ed.2d 245 (1975); *Perkins v. Matthews*, 400 U.S. 379, 388–90, 91 S.Ct. 431, 436–37, 27 L.Ed.2d 476 (1971); *City of Petersburg, Virginia v. United States*, 354 F.Supp. 1021, 1028 n.16 (D.D.C. 1972), aff'd, 410 U.S. 462, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973). Similarly, any modification of voting plans or procedures is by definition subject to preclearance under section 5. *See, e. g., City of Rome*, 100 S.Ct. at 1554; *Beer v. United States*, 425 U.S. 130, 133, 96 S.Ct. 1357, 1360, 47 L.Ed.2d 629 (1976); *Georgia v. United States*, 411 U.S. 526, 530–35, 93 S.Ct. 1702, 1705–08, 36 L.Ed.2d 472 (1973); *Perkins v. Matthews*, 400 U.S. at 390–94, 91 S.Ct. at 437–39; *Allen v. Board of Elections*, 393 U.S. 544, 563–71, 89 S.Ct. 817, 830–34, 22 L.Ed.2d 1 (1969). Finally, the Court deems the scope of section 5 broad enough to encompass the creation of elected advisory councils from the areas formerly known as Pear Ridge and Lakeview. *See Allen v. Board of Elections*, 393 U.S. at 563–71, 89 S.Ct. at 817–34; *Horry County v. United States*, 449 F.Supp. 990, 995 (D.D.C. 1978).

■ The burden of proving that the above-mentioned voting changes are nondiscriminatory rests squarely on the plain-

tiff. *City of Rome*, 100 S.Ct. at 1565 n.18; *Georgia v. United States*, 411 U.S. at 539, 93 S.Ct. at 1710; *South Carolina v. Katzenbach*, 383 U.S. at 335, 86 S.Ct. at 822; *Hale County v. United States*, 496 F.Supp. 1206, 1215 (D.D.C. 1980); *City of Petersburg*, 354 F.Supp. at 1027–28. More specifically, plaintiff must demonstrate by a preponderance of the evidence that the proposed "standard, practice or procedure" does not have the purpose of denying or abridging the right to vote on account of race, color, or linguistic affiliation and that it will not have that effect. *City of Rome*, 100 S.Ct. at 1559–60; *City of Petersburg*, 354 F.Supp. at 1027.

 Upon consideration of the entire record before us, we conclude that the City of Port Arthur has failed to shoulder this burden. Although plaintiff has established that the principal motives for enlarging its boundaries and creating advisory councils were non-discriminatory, the City has not shown the lack of a discriminatory purpose behind the adoption of either the 4–4–1 or the 8–0–1 plans. Viewing those electoral systems in the context of expanded borders as we must, we also find that plaintiff has failed to prove that their implementation will not have a discriminatory effect. For the same reason, we decline to approve the institution of advisory councils elected by the people of Pear Ridge and Lakeview. Because the evidence of discriminatory purpose is buttressed by that relating to discriminatory effect, we will address those issues in the reverse order.

A. Effect of the Voting Changes

1. In the context of the expanded City, each of the proposed voting plans has a discriminatory effect.

 We deal first with the question of whether or not the expansion of Port Arthur in conjunction with the voting plans at issue has the effect of denying or abridging the right to vote within the meaning of section 5 of the Voting Rights Act. It has often been acknowledged that additions such as the consolidation of Port Arthur with Pear Ridge and Lakeview and the subsequent annexation of Sabine Pass "present unusual considerations and require special judicial treatment." *City of Rome*, 472 F.Supp. 221, 245 (D.D.C. 1979), *aff'd*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). Virtually any consolidation or annexation will alter the racial composition of the jurisdiction thereby diluting the voting strength of one racial group or another. Were section 5 to prohibit expansion for that reason alone, a city "would be effectively locked into its original boundaries" and unable to respond to the compelling, non-discriminatory requirements of municipal finance, orderly growth, or the provision of city services. *Id.; City of Petersburg*, 354 F.Supp. at 1030. As we have recognized in the past, such a result could not have been intended by Congress when it enacted the Voting Rights Act. *City of Rome*, 472 F.Supp. at 245; *City of Petersburg*, 354 F.Supp. at 1030; *accord, City of Richmond*, 422 U.S. at 369, 95 S.Ct. at 2303. Consequently, this Court has adopted an approach endorsed by the Supreme Court whereby a boundary enlargement which "significantly reduces the proportion of voters of a particular race" will only be refused preclearance under the "effect" test if the minority race is "denied the opportunity to obtain 'representation reasonably equivalent to [its] political strength in the enlarged community.'" [149] *City of Rome*, 472 F.Supp. at 245, *aff'd*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119, *quoting City of Richmond*, 422 U.S. at 370, 95 S.Ct. at 2304;

**149.** Plaintiff urges this Court to substitute the analysis developed in *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), for the inquiry suggested by *City of Petersburg* and its progeny when judging the "effect" of the expansion and related voting changes before us. In *Beer v. United States*, the Supreme Court held that "a legislative reapportionment that enhances the position of racial minorities with respect to their effective exercise of the electoral franchise can hardly have the" prohibited effect. 425 U.S. at 141, 96 S.Ct. at 1364. This conclusion followed from Justice Stewart's determination that "the purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exer-

*accord, United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 160, 97 S.Ct. 996, 1007, 51 L.Ed.2d 229 (1977); *City of Petersburg*, 354 F.Supp. at 1030.

cise of the electoral franchise." *Id.* "Congress desired," he reasoned, "to prevent States from 'undo[ing] or defeat[ing] the rights recently won' by Negroes." *Id.* at 140, 96 S.Ct. at 1363, *quoting* H.R.Rep. No. 91–397, p. 8.

Originally, plaintiff City of Port Arthur proposed that the " 'non-retrogression/enhancement' analysis of *Beer* is in fact and law the same standard as the 'reasonable equivalence' test of *Richmond*." Plaintiff's Brief at 39 (filed December 15, 1980). Arguing that "there is no warrant in law or reason for the application of dramatically different cirteria [sic] to measure compliance with Section 5 depending on whether the voting change in question is an annexation or something else," plaintiff contends that the voting change at issue must be approved if it is found not likely to lead to retrogression in minority voting strength. *Id.* To buttress this position, plaintiff directs our attention to footnote 11 in *Beer v. United States*:

> This Court has not before dealt with the question of what criteria a legislative reapportionment plan must satisfy under § 5. Last Term in *City of Richmond v. United States*, the Court had to decide under what circumstances § 5 would permit a city to annex additional territory when that annexation would have the effect of changing the city's Negro population from a majority to a minority. The Court held that the annexation should be approved under the "effect" aspect of § 5 if the system for electing councilmen would likely produce results that "fairly reflect[ed] the strength of the Negro community as it exists after the annexation." The *City of Richmond* case thus decided when a change with an adverse impact on previous Negro voting power met the "effect" standard of § 5. The present case, by contrast, involves a change with no such adverse impact upon the former voting power of Negroes.

425 U.S. at 139 n.11, 96 S.Ct. at 1363 n.11 (citations omitted).

We reject plaintiff's argument that the simple analysis used in *Beer v. United States* to test the effect of voting procedure changes can be transferred to complex situations involving consolidations and annexations. As mentioned above, federal courts have recognized the unusual considerations inherent in the enlargement of municipal boundaries and have developed a special method for judging the effect thereof. Before and after the opinion was handed down in *Beer v. United States*, the Supreme Court has consistently conditioned preclearance of territorial expansions upon proof that the additions "significantly altered the racial balance" and that the post-enlargement "political system ensures the black community representation reasonably commensu-

rate with its voting strength in the expanded city." *City of Rome*, 472 F.Supp. at 246, *aff'd*, 446 S.Ct. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119, *accord, City of Richmond*, 422 U.S. at 368–71, 95 S.Ct. at 2302–04.

An examination of the circumstances underlying election procedure changes as opposed to boundary enlargements reveals the wisdom of this special standard. Because the same population with the same racial balance is affected by a procedural change such as reapportionment, it is reasonable to fix the minimum level of representation under the new plan at the level achieved by the same voters under the former plan. When new citizens are added to the municipal population by virtue of a consolidation or an annexation, however, they should not suffer for the failure of the old inhabitants to achieve proportional representation. Implicitly acknowledging the impropriety of such a comparison and the need for flexibility, the Supreme Court has demanded that the minority be afforded representation reasonably equivalent to its political strength in the enlarged community.

We are mindful of Justice Stewart's observation that the "non-retrogression" rule was inconsistent with the result reached in *City of Richmond* because the "chang[e of] the city's Negro population from a majority to a minority" had "an adverse impact on previous Negro voting power," *Beer v. United States*, 425 U.S. at 139 n.11, 96 S.Ct. at 1363 n.11, but we suggest that any boundary enlargement which decreases the proportion of minority voters has a similar "adverse impact" which would warrant the denial of preclearance according to *Beer v. United States*. Rather than banning all such expansions, as it would procedural changes with an "adverse impact," the Supreme Court permits enlarged jurisdictions to cure the discriminatory effect by guaranteeing that the minority race will have the opportunity to obtain representation reasonably commensurate with its voting strength in the expanded community.

Although the City of Port Arthur advanced the above line of reasoning throughout the trial and in its post-trial brief, plaintiff suddenly shifted position in its final submission. Plaintiff then asserted that "this lawsuit presents an expansion plus a legislative reapportionment" and that only the latter should be subjected to the analysis recommended in *Beer v. United States*. Plaintiff's Reply to Defendant's Supplemental Pleading at 6. This eleventh-hour explanation, however, does nothing to advance plaintiff's position and only raises further doubts concerning the legitimacy of the City's initial stance. The cases dealing with annexation clearly establish that the effect of the addition of territory cannot and should not be

This analysis was initially applied to the City of Petersburg, Virginia, which was marred by a long history of state-imposed segregation and discrimination which manifested itself in almost total bloc voting by race. *City of Petersburg*, 354 F.Supp. at 1025. Although blacks had won some council seats by majority vote in at-large elections, the City Council had always had a majority of white members who had generally proven unresponsive to the expressed needs and desires of the black community. *Id.* at 1026–27. The annexation in question increased the white population by 30% and the number of blacks by only 1%, shifting the latter group from a majority to a minority of the electorate. *Id.* at 1024. We realized that the annexation *per se* was not discriminatory, but we held that:

> the dilution here has occurred as a result of the annexation in the context of at-large elections and bloc-voting by race, and under these circumstances it abridges the right to vote on account of color by impairing the ability of blacks to elect candidates of their choice and to have their ideas on political matters afforded the recognition to which they are entitled on their merits and by virtue of their individual citizenship and their numerical strength in the community.

*Id.* at 1029. Rather than simply forbidding the annexation, however, we required the City to shift from an at-large to a ward system of electing its councilmen even though "the force of black voting strength will be increased over the results they have been able presently to achieve even with a majority of the voters." *Id.* at 1031. The Supreme Court affirmed without opinion. 410 U.S. 462, 93 S.Ct. 1441, 35 L.Ed.2d 698.

The approach we adopt was next exemplified by *City of Richmond*, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245. There, after Richmond annexed some adjacent territory which augmented the number of whites by 32% and blacks by just over 1% thus transforming the former black majority into a 42% minority, the City implemented a single-member district plan which promised to produce four black councilmen on a nine-member Council. *Id.* at 363, 366, 95 S.Ct. at 2300, 2301. Despite the diminution in relative black voting strength, the Supreme Court upheld the annexation and the ward system because the electoral system "would afford [blacks] representation reasonably equivalent to their political strength in the enlarged community.... Negro power in the new city is not undervalued, and Negroes will not be underrepresented on the council." *Id.* at 370–371, 95 S.Ct. at 2303–2304.

Most recently, we addressed the problem of annexations which decrease the minority proportion of the population in *City of Rome*, 472 F.Supp. 221. The circumstances of the black minority were not as grievous as those in *City of Petersburg*. Black voters had not been impeded by direct barriers to voting for many years, and the white elected officials had been quite responsive to the needs of the black community. *Id.* at 224–25. Very few blacks had run for office, however, and no black candidate had ever won an election; although there was no statistical demonstration of racially polarized voting, we concluded that "a substantial measure of racial bloc voting" existed. *Id.* at 225–27. In this context, Rome proceeded to annex areas in which "presently close to 10% of the white voters, and virtually none of the black voters, reside." *Id.* at 247. As the Supreme Court later explained with approval, the district court determined that the City failed to prove

judged independently of the post-expansion electoral system. *See City of Richmond*, 422 U.S. at 368–72, 95 S.Ct. at 2302–04; *City of Rome*, 472 F.Supp. at 245–48; *City of Petersburg*, 354 F.Supp. at 1031. In fact, in *City of Rome*, this Court specifically demanded scrutiny of the "post-annexation political system [to ensure] the black community representation reasonably commensurate with its voting strength in the expanded City." 472 F.Supp. at

246. Although we ultimately determined the effect of Rome's annexations in the context of the electoral rules which carried over from the years preceding the enlargement, we also noted that we would have denied preclearance of the annexations in conjunction with the post-expansion procedural changes had they not been separately declared discriminatory. 472 F.Supp. at 247.

"that its electoral system 'fairly reflects the strength of the Negro community as it exists after the annexation[s]' . . . based on the presence of three vote-dilutive factors: the at-large electoral system, the residency requirement for officeholders, and the high degree of racial bloc voting." *City of Rome*, 100 S.Ct. at 1567. Nevertheless, we declined to condition approval of the annexations upon adoption of a single-member district plan as in *City of Petersburg.* Among the reasons for this decision were the less serious circumstances in *City of Rome*, the recognized advantages of a ward system, the unwillingness to intrude in the City's affairs, and the flexible position taken by the Attorney General on the issue. 472 F.Supp. at 247–49.

In analyzing the effect of the expansion of Port Arthur's borders, we first conclude that it significantly altered the racial balance in the City. Rather than viewing the consolidation and the subsequent annexation separately, we will treat them as a single and unified voting change because of their "indivisible cumulative impact on black voting strength and in order to prevent frustration of the Act through piecemeal changes." *City of Rome*, 472 F.Supp. 247. Furthermore, we rely upon "the most current available population data," the 1980 Census, to make this determination.[150] *City of Rome*, 100 S.Ct. at 1567. We do not, as plaintiff argues, compare pre-expansion population figures based on 1970 Census data with post-expansion figures derived from the 1980 Census,[151] but rather we attempt to respond to the current situation by looking only at the populations which now reside in the City and the added areas.

The 1980 Census reveals that the communities with which Port Arthur joined contain 5,675 whites and 111 blacks while the inhabitants of the enlarged City include 32,410 whites and 24,741 blacks.[152] Thus, over 17% of the whites and virtually none of the blacks live in the new areas.[153] Although the effect of the territorial enlargement here is not as pronounced as it was in *City of Petersburg* or *City of Richmond* where the additional white population was over 30% of the total and the black community was reduced from an electoral majority to a minority, the effect in the instant case is significant nonetheless. In *City of Rome*, we held that the racial balance was substantially altered when only "10% of the white voters, and virtually none of the black voters, reside in the annexed area." 472 F.Supp. at 247. Because the impact of the consolidation with Pear Ridge and Lakeview and the annexation of Sabine Pass is nearly twice as great as that in *City of Rome*, we must inquire further whether blacks have a fair opportunity to obtain representation reasonably proportionate to their post-expansion numerical strength.

The conclusion reached by this Court is that none of the electoral systems proposed

150. *See* note 5 *supra*. When *City of Rome* was before this Court, we offered the following explanation for using the most recent information:

This approach comports with the terms of section 5, . . . which requires, in the future tense, that the plaintiff jurisdiction demonstrate that its voting changes "will not" have a discriminatory effect; it comports also with the fact that cities frequently annex relatively unpopulated areas for purposes of future growth and development. Prior judicial opinions further teach that a court in Voting Rights Act cases should respond to the realities of a situation as they exist at the time of decision.

472 F.Supp. at 246–47.

151. *See* Plaintiff's Brief at 12 (filed December 15, 1980).

152. *See* text accompanying notes 89 & 90 *supra*.

153. Although the Supreme Court has expressed a preference for VAP data in section 5 cases, *City of Rome*, 100 S.Ct. at 1567 & n.22; *United Jewish Organizations*, 430 U.S. at 164 & n.23, 97 S.Ct. at 1009 & n.23, the only such information which the parties have submitted to this Court relate to the 1970 Census. *See* note 5 *supra*. According to that data, Pear Ridge, Lakeview and Sabine Pass contained 5,512 non-blacks and 63 blacks of voting age. Given that the non-black VAP of the enlarged City was 30,115 and the black VAP was 13,096, we observe that the expansion of Port Arthur added over 18% of the voting-age non-blacks and only 0.48% of the voting-age blacks. This result reinforces the conclusion drawn in the text on the basis of the 1980 Census data.

by plaintiff Port Arthur affords the black citizens of the City the requisite opportunity to achieve representation commensurate with their voting strength in the enlarged community. Blacks comprise 40.56% of the total post-expansion population, and we estimate that they constitute 35% of the voting-age population.[154] Neither the 4–4–1 plan, the 8–0–1 scheme, nor the pre-existing 6–0–1 system offers the black community a reasonable possibility of obtaining representation which would reflect political power of that magnitude.

The voting system most recently adopted and the one upon which plaintiff principally relies is the 4–4–1 plan: four members residing in different districts elected at large, four members elected from single-member districts, and the mayor elected at large. Due to a combination of vote-dilutive factors, this plan insufficiently neutralizes the adverse impact on the black community occasioned by the enlargement of the City. First, the black and white communities in Port Arthur have become seriously polarized with respect to voting because of the direct and indirect discrimination suffered by black Port Arthurians for many years and the failure of City officials to be responsive to black interests and needs. Although the history of race relations in Port Arthur may not be quite as tainted as that

described in *City of Petersburg*, the instant circumstances do resemble those in Petersburg in that whites have dominated the political process, have been elected by "almost total bloc voting by race," and have then been inattentive to the problems of providing blacks with city services and jobs. Furthermore, the racial situation in Port Arthur is somewhat worse than that described in *City of Rome* where the municipal government was more responsive to the black community and the evidence of racial polarization was less convincing.

In addition, the 4–4–1 plan contributes to the diminution of minority voting strength. As determined in *City of Petersburg* and *City of Rome*, the black population effectively has no opportunity to elect the at-large council members. Where blacks constitute only 40% of the total population and 35% of the VAP, they cannot defeat candidates proffered by their white opponents in a racially polarized atmosphere.[155] Moreover, this situation is exacerbated by the majority vote and residency requirements included in the 4–4–1 system because these features tend to promote head-to-head contests between black and white candidates and undermine the possibility of electing a council member of the minority's choice by single-shot voting.[156] In fact, under these

154. An estimate of the percentage of the VAP which is black can be derived by extrapolation from the 1970 Census data. In 1970, blacks accounted for 40.01% of the total population of old Port Arthur and 34.62% of the VAP. Ten years later, blacks are also approximately 40% of the population (of the enlarged City), so they presumably form close to 35% of the VAP. The Court is cognizant of the dangers involved in such analyses, but it notes that plaintiff and defendant United States have both suggested that we adopt this method. *See* Plaintiff's Brief at 42; Request of Defendant United States of America to Take Judicial Notice at 5.

155. *See* Tr. II, 25 (testimony of Charles Cotrell); Cotrell Dep. 44–45; Davidson Dep. 9, 114. The Supreme Court has also recognized the inescapable logic of this conclusion:

Where it occurs, voting for or against a candidate because of his race is an unfortunate practice. But it is not rare; and in any district where it regularly happens, it is unlikely that any candidate will be elected who is a

member of the race that is in the minority in that district.

*United Jewish Organizations*, 430 U.S. at 166–67, 97 S.Ct. at 1010–11 (1977).

156. The United States Commission on Civil Rights has reported that:

There are a number of voting rules which have the effect of frustrating single-shot voting .... [I]nstead of having one race for four positions, there could be four races, each for only one position. Thus for post no. 1 there might be one black candidate and one white, with the white winning. The situation would be the same for each post, or seat—a black candidate would always face a white in a head-to-head contest and would not be able to win. There would be no opportunity for single-shot voting. A black still might win if there were more than one white candidate for a post, but this possibility would be eliminated if there were also a majority requirement.

[Second,] each council member might be required to live in a separate district but with

conditions, a black candidate has never beaten a white at large in Port Arthur's history, and the only black man to have won a councilmanic position by at-large vote has not been the choice of the black community in recent years. Although theoretically possible, black Port Arthurians have not even wielded a swing vote in at-large races between two or more white contestants. Thus, the black voters of the City essentially have no role in determining the outcome of the five at-large elections for council seats.[157]

With respect to the four remaining single-member posts, there is no dispute that two will be totally outside the sphere of influence exerted by the black minority if

> voting still at large. This—just like numbered posts—separates one contest into a number of individual contests.
> [Third,] the terms of council members might be staggered. If each member has a 4-year term and one member is elected each year, then the opportunity for single-shot voting will never arise.
> U. S. Comm'n on Civil Rights, The Voting Rights Act: Ten Years After, 207–08 (1975). *See also* Tr. II, 16, 18–19 (testimony of Charles Cotrell).

**157.** We include the mayor among the council members elected by at-large vote; thus, the City Council consists of nine positions under the 4–4–1 and 8–0–1 plans or seven positions under the 6–0–1 plan. Although the additional ceremonial and "political" responsibilities assigned to the mayor do distinguish him from the other council members, we find controlling the fact that the mayor casts an equal vote on all issues before the Council. *See* text accompanying note 20 *supra*. When determining the minority's opportunity to obtain "representation," the mayor must be considered.

**158.** Tr. II, 23–25 (testimony of Charles Cotrell); Bowers Dep. 27; Davidson Dep. 8–9; Hofeller Dep. 35–36; McManus Dep. II, 90.

**159.** Tr. II, 23–25 (testimony of Charles Cotrell) (based on 1970 Census data and 1979 estimate); Bowers Dep. 27 (based on 1970 Census data); Davidson Dep. 8–9 (based on 1979 estimate); Hofeller Dep. 35–36 (based on 1980 estimate); McManus Dep. II, 90 (based on 1979 estimate).

**160.** Defendant United States contends that the 61.11% majority held by the blacks in District 4 is insufficient to insure them the opportunity to elect a representative there. *See* Post-Trial Brief of Defendant United States of America at

the pattern of racially polarized voting persists.[158] Comprising only 19.81% of the total population in District 2 and 5.73% of that in District 3, blacks have no power to affect the outcome of the single-member races in those wards. Similarly, the Court agrees with the unanimous expert testimony that the representative elected by District 1 will be selected by the black community which accounts for 80.86% of the population therein.[159] Finally, although there is some evidence that the blacks who make up 61.11% of the population of District 4 will have difficulty controlling the result of the election in that district, we find that there is indeed a reasonable probability that the choice of the black voters will prevail.[160]

44–45 (filed December 23, 1981); Defendant United States of America's Request to Take Judicial Notice at 3–5. In support of this assertion, defendant cites the testimony of Dr. Charles Cotrell to the effect that District 4 was "getting close ... to a problematic district" when it was estimated to be 63.5% black. Tr. II, 23. Defendant also refers us to *State of Mississippi v. United States,* 490 F.Supp. 569, 575 (D.D.C.1979), *aff'd,* 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980), for the proposition that "it has been generally conceded that, barring exceptional circumstances such as two white candidates splitting the vote, a district should contain a black population of at least 65 percent or a black VAP of at least 60 percent to provide black voters with an opportunity to elect a candidate of their choice." *See also Donnell v. United States,* C.A. No. 78–0392 (D.D.C. July 31, 1979), *aff'd,* 444 U.S. 1059, 100 S.Ct. 226, 62 L.Ed.2d 168 (1980).

Although blacks comprise only 61.11% of the total population of District 4 and approximately 55% of the VAP, *see* notes 109 & 154 *supra,* we nevertheless adjudge that number sufficient to provide them with the chance to elect a candidate of their choice. Unlike *State of Mississippi,* we have found that black voter turnout and general political activity nearly approximate that of the white community. *See* text accompanying notes 129–31. Therefore, it is not necessary that blacks attain a 65% over-all majority or a 60% majority of the VAP in order to obtain representation in District 4. Moreover, we note that individuals of Hispanic origin comprise 2.7% of the district's population thereby relegating white citizens to a maximum of 36%. Unless we assume that whites, Hispanics, and other minorities vote as a monolithic group, the black inhabitants of District 4 will certainly derive the benefits of their clear majority.

We reach these conclusions concerning the probable impact of the 4–4–1 plan despite arguments to the contrary offered by plaintiff. According to the City, there is a distinct possibility that one or more at-large seats will be subject to the control of the black community. With respect to District 1, for example, Port Arthur observes that a black man, Arthur Guidry, has been continually re-elected at-large since 1963, that a white candidate has never surfaced to challenge him, and that a black will continue to be elected due to a "sense of fairness." [161] The Court, however, is not persuaded. As racial polarization has increased in recent years, Mr. Guidry has not been the choice of the black minority; he has only won re-election because he has the support of the white population. Secondly, although District 1 has never produced a white candidate in the past, the inclusion within that ward of Sabine Pass, a separate, predominantly white community with independent interests, can be expected to result in white candidacies which will prevail in the City's racially polarized atmosphere. Lastly, the subjective judgment of Dr. Susan McManus that the voters of Port Arthur will elect a third black council member out of a "sense of fairness" is not credible where there is racial bloc voting and there are already two black members from single-member Districts 1 and 4.

For similar reasons, plaintiff's contention that a black candidate from District 4 will prevail in an at-large race fares no better. At approximately 36% of the ward's population, the number of whites in this district significantly exceeds the number in District 1, and it insures the emergence of a candidate who represents their interests. Without the so-called sympathy vote, this white candidate is then fairly certain to succeed at large when the white majority normally votes for the white candidate.

The third at-large position which plaintiff urges could be won by the minority's candi-

date is that of the mayor. In support of this proposition, the City cites testimony by A. Z. McElroy, a former black mayoral candidate, and George Dibrell, the City Manager.[162] However, we must discount the statements of both witnesses; Mr. McElroy based his conclusion on the premise that blacks were an electoral majority, and Mr. Dibrell's conclusory opinion was that of an "interested witness" who was a proponent of the 4–4–1 plan and continued to serve as a City official after its enactment. *See City of Richmond,* 422 U.S. at 377, 95 S.Ct. at 2307; *Hale County v. United States,* 496 F.Supp. at 1217. Once again, we conclude that a white victory is inevitable in view of the high degree of racial bloc voting and the existence of a white majority in the City.

A final defense raised by plaintiff in its effort to prove that the 4–4–1 plan is without a discriminatory effect concerns the Hispanic minority. Assuming that the 6.30% of Port Arthur's population which is of Spanish origin is evenly distributed throughout the enlarged City, Dr. McManus testified that a pure single-member district system would render the Mexican-Americans "almost helpless in terms of, (a) electing their own person to [the] Council, and (b) being able to leverage any of the other ... Council members."[163] On the other hand, if at-large seats are available, Hispanic citizens will supposedly have more opportunity to achieve political representation and might even gain a council position due to the omnipresent "sense of fairness." In the opinion of Dr. McManus, the 4–4–1 scheme is the best accommodation of the separate black and Hispanic political interests.

Although we recognize that Mexican-Americans are protected under the Voting Rights Act just as other minorities are, we fail to see the merit in plaintiff's position. There is substantial evidence that the resi-

**161.** *See* McManus Dep. II, 95–96; Post-Trial Reply Brief of City of Port Arthur at 2–3.

**162.** Tr. I, 79 (testimony of George Dibrell); McElroy Dep. 14–15, 31–34.

**163.** McManus Dep. I, 25, 31–33.

dents of Spanish origin are not equally dispersed throughout Port Arthur, and, therefore, it is conceivable that the Mexican-Americans in a single ward might exercise significantly more voting power in a single-member district contest than the city-wide Hispanic population could wield at large. Even if plaintiff's assumption that this group is evenly distributed were correct, the Court rejects the suggestion that the Spanish-speaking minority would be more influential in an at-large race than in a single-member district election; a constant proportion of the population made up of Mexican-Americans should have the same voting power regardless of the size of the electoral unit. Moreover, plaintiff has not sufficiently demonstrated that this voting power is of any consequence. With only 6.30% of the total population and no apparent political cohesion, Port Arthur's Hispanic community is unlikely to have an important impact on any election. To the extent that Port Arthurians of Spanish origin will affect the political process, they may do so with equal ease in a ward system or in an at-large setting.

In sum, the 4–4–1 plan presents the black minority in the City of Port Arthur with the opportunity to elect two candidates of its choice to the nine-member City Council. Where blacks constitute 40.56% of the total population and approximately 35% of the VAP, an election plan which affords them the potential to select only 22.22% of the council members seriously undervalues their voting strength. Though we are aware that "members of a minority group have [no] federal right to be represented in legislative bodies in proportion to their number in the general population," *Beer v. United States*, 425 U.S. at 136 n.8, 96 S.Ct. at 1361 n.8, *citing Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971), we hold that the 4–4–1 scheme in the context of highly polarized racial bloc voting does not adequately neutralize the adverse impact of the expansion of Port Arthur by providing the black community with the opportunity to obtain representation reasonably equivalent to its voting strength in the enlarged City.

In view of our findings with respect to the 4–4–1 plan, we need only pause for a moment to consider the effect of the 8–0–1 plan. Given the existence of racial bloc voting, the Court concludes, as we did in *City of Rome*, that this at-large electoral system with a residency requirement is inadequate. Judging by the 1970 Census figures, white candidates will in all likelihood emerge from every district except perhaps District 5 where blacks constituted 96.35% of the total population and 95.46% of the VAP. Because of the history of black failures to defeat whites at large and the increasing racial polarization, black Port Arthurians will elect no more than one of nine representatives under the 8–0–1 plan. With one person of the black minority's choice already on the Council, a second is not likely to be forthcoming out of a "sense of fairness." Finally, for the reasons elaborated upon earlier, a pure at-large plan is no more advantageous for the Mexican-American population in the City than a plan encompassing single-member districts.

Having rejected the 4–4–1 and 8–0–1 plans for insufficiently neutralizing the adverse impact on the black minority caused by the enlargement of Port Arthur, we must now consider the effect of the 6–0–1 scheme which presumably carries over to the present from the period preceding the expansion. *See City of Rome*, 472 F.Supp. at 247. The record is devoid of evidence relating to this election plan subsequent to the consolidation and annexation. Nevertheless, we find that it cannot withstand our scrutiny because it suffers from each of the three vote-dilutive factors for which we condemn the 8–0–1 system. Thus, plaintiff City of Port Arthur has failed to carry its burden of demonstrating that it has implemented a voting plan which insures the black population an opportunity to obtain representation reasonably commensurate with its voting strength in the enlarged community.

2. The establishment of advisory councils has a discriminatory effect.

 When the City Council of Port Arthur officialized the consolidation with Pear

Ridge and Lakeview, two supplementary ordinances were enacted which established independent advisory councils for those two areas. Elected by the predominantly white residents of the two communities, the members of these councils were to have direct access to and influence on the decision-making process of the municipal government for a five-year transition period. Because the minority populations in the City do not have the opportunity to elect advisory representatives such as these, we are compelled to declare the Pear Ridge and Lakeview Advisory Councils discriminatory in effect. Plaintiff has failed to present any evidence which would warrant the opposite conclusion.

### B. Purpose of the Voting Changes

██ Under section 5, we need not reach the issue of whether the changes in voting standards, practices or procedures were undertaken with the purpose of denying or abridging the right to vote on account of race, color or language-affiliation if we find that these same actions have a discriminatory effect. Nevertheless, the substantial evidence that plaintiff was motivated to adopt the 8–0–1 and the 4–4–1 plans by an impermissible intent provides an alternative basis for denying preclearance. In fact, even if the effect of these electoral modifications was entirely legal, the implication of a discriminatory purpose would be sufficient reason for us to prohibit their implementation. *See City of Richmond*, 422 U.S. at 378, 95 S.Ct. at 2307.

We begin with the rule of law that "an official action, whether an annexation or otherwise, taken for the purpose of discriminating against Negroes on account of their race has no legitimacy at all under our Constitution or under the statute." *Id.* In order to identify this illegal purpose, the court may—indeed must—conduct:

a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it "bears more heavily on one race than another," *Washington v. Davis* [426 U.S.] at 242 [, 96 S.Ct. at

2049]—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face .... The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.... The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes.

*Village of Arlington Heights v. Metropolitan Development Corp.*, 429 U.S. 252, 266–67, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977) (citations omitted). *See also Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Hale County*, 496 F.Supp. at 1218; *City of Rome*, 472 F.Supp. at 243.

Generally, in section 5 suits, plaintiff bears the burden of proving by a preponderance of the evidence that an invidious purpose did not exist. *See Hale County*, 496 F.Supp. at 1218. When dealing with the accretion of land by a state or political subdivision, the Supreme Court has permitted plaintiffs to escape the consequences of a contemporaneous discriminatory intent if it can be demonstrated that "there are now objectively verifiable, legitimate reasons for the annexation." *City of Richmond*, 422 U.S. at 375, 95 S.Ct. at 2306.

1. The consolidation of Port Arthur with Pear Ridge and Lakeview and the annexation of Sabine Pass are not infected by a discriminatory purpose.

██ Initially, the Court must examine the historical background of the consolidation of Port Arthur with Pear Ridge and Lakeview and the subsequent annexation of Sabine Pass. Plaintiff City of Port Arthur would have us believe that this history was unstained by official discriminatory acts and that there were legitimate motives for its attitude toward and participation in the expansion of its borders. The scenario begins with evidence of the City's long-standing interest in growth. Although the numerous efforts to annex or consolidate with

some of the surrounding communities in the 1940's and 1950's were not always successful, the City Council and the residents of Port Arthur routinely supported them. Then, in 1963, Port Arthurians turned their attention inward. Blacks and whites alike voted to substitute a new at-large voting scheme, the 6–0–1 plan, for the existing ward system in an attempt to rid the City of corruption which was believed to be associated with the latter plan.

With the arrival of the 1970's came a series of regional problems relating to municipal finance, services, and growth which once again led Port Arthur to ponder the possibility of joining with its neighbors. Because all of the surrounding black areas had already been absorbed, the City was compelled to focus on predominantly white communities. The PAS consulting group strongly recommended this action in 1973 and further counseled that the City would have to engage in an extensive promotional campaign to ensure success. After some additional prodding by residents of the neighboring towns, the City Council heeded the advice of PAS and consolidation with Pear Ridge and Lakeview was accomplished in 1977. Shortly thereafter, Port Arthur annexed Sabine Pass for many of the same administrative and economic reasons and in order to forestall the fragmentation of jurisdiction which had plagued it for so long on its eastern border. To accommodate the addition of approximately 7,000 new citizens, the City attempted to enlarge the Council by implementing the 7–0–1 plan.

In reviewing the events preceding the expansion of Port Arthur's boundaries, however, the Court cannot overlook certain events which suggest that municipal officials were at least partially motivated by a desire to abridge the electoral rights of the black population. Although the black citizens of the City had long been the objects of discrimination and segregation, the first official action of significance to this inquiry was the redrawing of district lines in 1963 on an east-west axis. As a result, the majority of black citizens remained concentrated in the first district, and the increasing black population east of Houston Avenue was diluted by combining it with the white areas further east. The second suspect action of the City Council was the publication of a series of advertisements in the Port Arthur News warning of the effort "to rally the local black community to gain control of the city government" in the April, 1977, councilmanic elections. Despite plaintiff's attempt to color these ads as admonitions of an "outside takeover," they were obviously intended to alert the white population to the serious political challenge posed by black Port Arthurians.

The circumstances surrounding the initiation of the consolidation drive by municipal officials offer a third bit of incriminating evidence. Although the PAS report recommending consolidation had been in the City Council's possession since 1973 and a few individuals from the neighboring towns had made inquiries on the subject since 1975, no action was taken by the City until immediately after the white candidates narrowly won the highly polarized elections in April, 1977. In the course of the ensuing consolidation campaign, Mayor Sadler and City Manager Dibrell arranged for the controversial meetings with white representatives of Pear Ridge, Lakeview and Griffing Park. Among the advantages cited in favor of consolidation at those meetings was the so-called "stabilization of the population" which was little more than a euphemism for controlling the increasing proportion of the population comprised by blacks.

Finally, between the effective date of the consolidation and the completion of the Sabine Pass annexation, the City Council revealed its invidious intent through its participation in the modification process which resulted in the 7–0–1 plan. Though the black community accounted for almost 40% of the population, only 27% of the individuals appointed to the Advisory Committee for Council Election System were black. When the racially-divided Committee later submitted two reports to the Council, the legislative body ignored the black minority's report recommending the adoption of a

single-member district plan and refused to read it at two public hearings.

Despite these indicia of an original discriminatory purpose, we find that plaintiff has successfully demonstrated the existence of legitimate reasons for the expansion as of the present time. Many of the mutual benefits of consolidation cited by Port Arthur in 1977 serve to justify the merger today. In the financial sphere, Pear Ridge and Lakeview now enjoy a reduction in their tax rate, the absorption by Port Arthur of their contractual debts for water and sewer service, and the City's assumption of their responsibility to make capital improvements to the same services. The City, on the other hand, ensured the automatic receipt of federal revenue-sharing funds for the foreseeable future by boosting the population level substantially beyond the threshold of 50,000.

Additionally, Port Arthur, Pear Ridge and Lakeview achieved certain economies of scale with respect to several municipal services. Not only did the three communities continue to share water and sewer services, but they have also joined police and fire protection forces. The quality of these combined, expanded services has been improved at little extra cost. Another service, that provided by the Port Arthur public library, remains available to all residents of the enlarged City free of charge. Lastly, we find a legitimate justification for consolidation in the expectation that the City would increase its visibility thereby attracting new businesses and creating new jobs.

Some of the same non-discriminatory incentives warrant Port Arthur's annexation of Sabine Pass. Obviously, the addition of Sabine Pass further guaranteed eligibility for mandatory federal funding and further increased the visibility of the City. Furthermore, Port Arthur prevented the fragmentation of jurisdiction which had plagued it to the east, obtained a deep water port, acquired an area for industrial growth, and gained control of offshore drilling activities.

Because we conclude that plaintiff has convincingly demonstrated the existence of legitimate purposes behind the joinder with Pear Ridge, Lakeview and Sabine Pass, we hold that plaintiff has satisfied the "purpose" test of section 5 with respect to voting changes occasioned by the enlargement of its borders.

2. The establishment of advisory councils from Pear Ridge and Lakeview was accomplished without a discriminatory purpose.

At the same time that the consolidation became effective, the City created Pear Ridge and Lakeview Advisory Councils, but, as mentioned above, little evidence relating to these councils has been adduced. In their defense, Mayor Sadler offered that they were created to smooth the transition for the two towns from being independent to being an integral part of a larger entity.[164] He added that the councils were only established for a five-year period expiring at the end of 1982. The intervenor-defendants have suggested, however, that the City offered to establish these councils in order to entice the surrounding townships to join their primarily white populations with Port Arthur.[165] Furthermore, they urge that the discriminatory effect which we have found is further evidence of the City's invidious purpose.

After weighing this limited evidence, the Court concludes that the preponderance thereof exhibits the absence of a discriminatory intent. The effort to portray the creation of these councils as mere bribery is nothing more than a conclusory allegation. Despite their unfortunate disparate impact, advisory councils such as these appear to be sensible devices for facilitating major changes such as the fusion of three formerly independent cities. That the councils will only exist for five years

---

**164.** Sadler Dep. I, 72.

**165.** Defendant Intervenors' Post-Trial Brief at 4.

convinces us that the purpose of instituting them was only to ease the transition.

3. The 8–0–1 and 4–4–1 plans were adopted for an illicit discriminatory purpose.

 Although we find that plaintiff has met its burden of proving that the territorial expansion and the establishment of advisory councils were accomplished without the purpose of denying or abridging the black minority's right to vote, we reach the opposite conclusion with respect to the adoption of the 8–0–1 and the 4–4–1 plans. Particularly when we view the events subsequent to the annexation of Sabine Pass in conjunction with those which preceded it, the vast preponderance of the evidence indicates that the last two voting changes submitted to us for preclearance were enacted with an invidious purpose.

As we have stated, the specter of discrimination was raised by the 1963 redrawing of district lines, and its continued existence was marked by the April, 1977, campaign advertisements. The severely polarized councilmanic election results then sparked a mysteriously sudden push for expansion which significantly diminished black voting strength. Rather than neutralizing the effect of this dilution, City officials devised the 8–0–1 and 4–4–1 plans which guaranteed that blacks would remain underrepresented on the City Council by comparison to their numerical strength in the enlarged community. Because of this invidious motive, we condemn the voting plans.

Even before the annexation of Sabine Pass was completed, the 7–0–1 plan, the first modification of the original 6–0–1 plan, was rejected by the Attorney General who recommended the implementation of a single-member district scheme. Nevertheless, the City Council stubbornly clung to the concept of at-large elections where single-shot voting was impeded by residency and majority vote requirements. Knowing that City politics were seriously polarized by race, the officials responsible for developing the 8–0–1 plan must have realized the improbability of the black population electing more than one candidate of its choice.

Even if the 8–0–1 plan produced two black council members as plaintiff allegedly intended, the black minority was invidiously denied equitable representation given that it was thought at the time to comprise 35.11% of the total population and 30.31% of the VAP.

When the Attorney General interposed an objection to the 8–0–1 plan, members of the Port Arthur firefighters' union designed the 2–6–1 plan in an effort to obtain section 5 approval. Despite the double censure of the Attorney General, the City Council opposed the firemen's plan and remained adamant about the election of all council members by at-large vote. The white team representing the City even refused to negotiate with the firefighters perhaps because it wished to dissociate the white firemen from the 2–6–1 plan in order to establish its own scheme as the official white plan. Later, when the black team presented the 2–6–1 plan as a compromise at the mediation table, it was officially rejected because it included too few at-large seats. The white team countered with the 4–4–1 plan, which guaranteed white Port Arthurians overwhelming control of seven of nine councilmanic positions even though 41.20% of all those in the City were estimated to be black. This was the City's "bottom line."

Immediately after the mediation negotiations collapsed, the white team organized a Citizens' Committee to place the 4–4–1 scheme on the referendum ballot as an alternative to the 2–6–1 proposal. The Mayor, the City Manager, and the City demographer did not participate in the Committee's work, but municipal resources were donated nonetheless. Though the 4–4–1 campaign propagandizers · refrained from making patently racist remarks, the Committee members continually reminded the voters to "keep our city government in the hands of *all* people" and emphasized the fact that a majority of council members—six of nine—would be voted on by each person. The racially polarized results of the referendum erase any doubts as to the

racist motivation driving the proponents of the 4–4–1 plan and those who voted for it.

Plaintiff has attempted to justify its support for these electoral plans by citing legitimate purposes. The 8–0–1 plan, for example, was touted as a means of enhancing representation of the black minority because the enlarged Council had more seats available and because the residency requirement limited the candidate pool. We explained earlier, however, that this expectation had little or no prospect of materializing in an atmosphere characterized by severe racially polarized voting. Also pretextual was the suggestion that the 8–0–1 scheme would advance the political position of the City's Mexican-American population. We have already shown that the two assumptions underlying this prediction, the even distribution of Hispanics throughout the community and the existence of a sympathy vote, are fallacious. Finally, plaintiff attributed its adherence to the all at-large concept to the municipal Charter's limitation on the power of the Council to alter the electoral system. Yet, within eight months, the Charter was amended so as to permit a new method of electing council members.

The justifications which Port Arthur has offered with respect to the 4–4–1 plan are similarly specious.[166] Initially, we note that it is quite tenuous for plaintiff to suggest that an association which the City's residents made between the ward system and corruption in the 1950's still governs attitudes toward electoral plans in 1981. Hence, we proceed to the consideration of plaintiff's second and more important contention that the "purpose of the 4–4–1 plan was to enhance minority voting strength, while preserving the legitimate benefits of the at-large system." We find, however, that any intention to increase the amount of representation that the black community could obtain was overriden by the desire of white Port Arthurians to maintain undisputed control of the municipal government. Furthermore, as we have demonstrated, plaintiff would have more successfully pre-

vented the dilution of the Hispanic vote by creating more single-member district seats. Lastly, although we recognize that at-large elections often produce representatives who are "more responsive to, and characteristic of, the interests of the entire city," *City of Petersburg*, 354 F.Supp. at 1027, such is not the situation in the instant case. The council members who have been elected at large in the past have proven far more responsive to, and characteristic of, the interests of their white constituency than to those of the black minority. As long as the whites remain in the majority and racial bloc voting continues to be prevalent, City officials may be elected at large by their white supporters alone, and they will have no incentive to address the problems of a significant segment of the City of Port Arthur, the black community.

## III. CONCLUSION

 For the foregoing reasons, we deny plaintiff City of Port Arthur's requests for declaratory judgments in Counts I, II and III as to Ordinance No. 80–02 establishing the 8–0–1 plan, Ordinance No. 80–70 declaring the results of the referendum election at which the 4–4–1 plan was adopted, and Ordinance Nos. 77–118 and 77–119 creating advisory councils from the former municipalities of Pear Ridge and Lakeview. We so decide because plaintiff has failed to demonstrate that the implementation of these three voting changes can be accomplished without the effect of denying or abridging the right to vote on account of race, color or language-affiliation. In addition, preclearance of the 8–0–1 plan and the 4–4–1 plan is denied because the preponderance of the evidence reveals that the development of these electoral systems was infected by a discriminatory purpose.

 With respect to the consolidation with Pear Ridge and Lakeview and the annexation of Sabine Pass, we find that plaintiff acted without an illegal invidious

166. *See* Plaintiff's Brief at 26–27.

purpose. The expansion of the City significantly diluted the voting power of the black minority, however, and Port Arthur has failed to show that any of the electoral systems which it has adopted assure the minority population an opportunity to elect representation reasonably equivalent to its electoral strength in the enlarged community. Therefore, we withhold approval of the territorial expansion until plaintiff has devised a new voting plan which satisfies the concerns expressed in our opinion.

In *City of Petersburg*, we conditioned preclearance of the annexation in question upon the adoption of a fairly-drawn single-member district plan. Although the Attorney General has suggested the same solution throughout this litigation, we hesitate to issue such an order. Our reluctance stems from our desire to minimize the intrusion of this federal court into the affairs of the City and from the indication in *Beer v. United States* that we are without the authority to affect the at-large rule directly. *See City of Rome*, 472 F.Supp. at 248. Instead, we will permit the City to develop an electoral system of its own design. In view of the extraordinary delay that has occurred since April, 1977, when councilmanic elections were last held in Port Arthur, however, we must require that plaintiff present this Court with an acceptable proposal within fifteen (15) days. We retain jurisdiction to insure that our will is carried out as expeditiously as possible.

An order and judgment in accordance with the foregoing shall be issued of even date herewith.

APPENDIX A

